2003 SD 125

**Travis L. ARNESON, Plaintiff and Appellant,**

v.

**Teresa E. ARNESON, Defendant and Appellee.**

No. 22639.

Supreme Court of South Dakota.

Argued May 30, 2003.

Decided Oct. 15, 2003.

Rhonda Lockwood, Rita Allen, Sioux Falls, for Plaintiff and Appellant.

Lee R. Burd, Sioux Falls, for Defendant and Appellee.

KONENKAMP, Justice.

[¶ 1.] This appeal concerns whether the circuit court improperly considered the father's physical limitations resulting from his cerebral palsy in deciding child custody between the parents. The father challenges three aspects of the court's decision: the child custody award to the mother, the use of his structured personal injury settlement as a "source of income" for child support, and the award of attorney's fees to the mother. Because the court considered the appropriate factors in determining child custody, child support, and attorney's fees, we affirm on all issues.

## I.

### Background

[¶ 2.] Travis and Teresa Arneson married on March 28, 1998. Their only child, Grace Marie Ann Arneson, was born on September 24, 1998. When Travis was six months old, he was diagnosed with cerebral palsy. At birth, he suffered a lack of oxygen caused by a physician's negligence. From the resulting medical malpractice

settlement, Travis now receives monthly personal injury payments for life.[1] He uses a wheel chair and a personal attendant. He does not consider himself "confined" to a wheelchair. He feeds and bathes himself. As he explained to the court in an affidavit, he is independent and capable of caring for himself: "I do hire personal assistants to help me with my day to day routines, not because I need the help but to make my life easier and improve the quality of my life."

[¶ 3.] Travis suffers no disability of intellect. He graduated with honors from high school and Southeastern Votech. An advocate for people with disabilities on both the local and national level, Travis works as a counselor at the Jaycee Camp for the Exceptional. He believes he is capable of caring for his child, "without assistance of an aide." On the subject of his daughter, he is passionate:

I am no different than any other parent. I love my child and I am able to care for her, albeit, not societies [sic] standard idea of care. My daughter gets all of her needs met with me; I love her and I am a positive influence on her emotionally. She loves spending time with me and I love spending time with her; we need each other just like any other parent/child relationship. Grace does not see me as disabled; she sees me as her daddy.

[¶ 4.] Teresa is equally devoted to her child. She believes that she provided for a greater share of Grace's physical needs when she and Travis lived together. For five months, when Grace was still in diapers, Teresa worked a night shift from 11:00 p.m. to 7:00 a.m., leaving Grace at home alone with Travis. During these absences, Teresa was comfortable with their arrangements for Grace because before Teresa left for work, Grace was already asleep and she slept through the night; Grace was an infant and not able to climb out of her crib; Teresa was only eight blocks away from the residence and had made arrangements with her supervisor to leave if there was an emergency. Moreover, Travis and Teresa had both talked to the neighbors about the situation so that Travis could call on a neighbor for help when needed. In fact, Teresa testified that Travis did call on neighbors to assist with diaper changes on occasions when Teresa ran errands. Teresa made sure before she left that Travis had attendants to assist him and that everything was lined up beforehand. On one other occasion, when the parties were having marital difficulties, Teresa went to stay with her parents. Although she wanted to take Grace with her, Travis would not allow it. She was gone for approximately one week.

[¶ 5.] In April 2001, Travis sued Teresa for divorce. While the action was pending, the circuit court ordered that they share custody of the child on alternating weeks. Travis's attendant later testified that during and before the time when this interim order was in place, Travis bathed, dressed, and fed his daughter. The attendant thought that any concerns about Travis's inability to react in an emergency situation were unfounded. This attendant had

---

1. The Arneson Release and Settlement Agreement dated December 2, 1985 provides that Travis's parents be paid "the sum of $1,500 per month commencing December 15, 1985, adjusted at the end of each succeeding year by a 3% escalation factor, compounded annually for a period of ten years." Furthermore, the agreement provided that Travis's mother, as guardian ad litem, would be paid "the sum of $4,167 per month, commencing December 15, 1992, adjusted at the end of each succeeding year by a 6% escalation factor, compounded annually, throughout the lifetime of Travis L. Arneson or until November 15, 2012, whichever period of time is longer."

worked in the home for four months while the parties were still living together. She believed that Travis was more active in parenting than Teresa.

[¶ 6.] Since August 2001, Travis has lived with Edith Krueger. They were married during the pendency of this appeal. Edith and Travis have known each other since 1985, when Edith was a child care worker at the Children's Care Hospital and School. Edith provides day care for six children in Travis's home. Although Grace was at the day care in Travis's home during his alternating weeks, Teresa refused to let Grace stay there on the weeks the child was with her because Travis would not let her take the child each night.

[¶ 7.] By stipulation, the parties agreed that the court would appoint Judy Zimbelman, MSW CSW–PIP, to perform a formal custody evaluation. Zimbelman filed a report and appeared at trial to give her opinion. In her report, she wrote:

Although Travis was able to demonstrate how he was able to care for Grace's physical needs, the majority of this time Travis has someone with him to take care of him should he need assistance. This person also cares for Grace when needed. Travis does a good job of being able to respond to Grace as needed. There are concerns for how Travis would be able to respond to Grace in times of sickness or emergency. He is able to move about in his wheelchair but it is unclear if he would be able to respond to an emergency. Travis described being able to place Grace into the bath tub as needed. With his own limitations, it appears Teresa would be able to better respond to Grace at her young age. Because of Grace's young age, it is important that she has supervision and can be responded to quickly.

Zimbelman later repeated these concerns in her testimony. On the other hand, Zimbelman reported that Travis had scored higher on the Parent Awareness Skills Survey. And Teresa had made some poor choices in male companions. Teresa took pains to tell Zimbelman that her latest companion was not around Grace often. Zimbelman recommended that Teresa obtain individual counseling on her relationship decisions.

[¶ 8.] On the subject of his disability, Zimbelman questioned whether Travis could care for Grace by himself. While acknowledging that he always made sure that Grace had the care she needs, Zimbelman noted that "Travis has care givers in his home for himself the majority of the time." She concluded that Travis's "limitations make him less able to care for Grace than Teresa." On the other hand, Zimbelman believed that at different stages of Grace's development, "there may be a need to change the parenting arrangement." As Grace becomes older, Zimbelman thought, "[I]t may be possible for her to split her time more equally with her parents."

[¶ 9.] Zimbelman concluded that "Grace is emotionally tied to her mother at this stage and needs to be with her mother on a daily basis." She also felt it important that Grace be in one home or the other: "Because of Grace's young age, it is better for a child to have a primary home. As she grows older, it may be easier for Grace to split her time with her parents." Although Travis preferred that Grace be with him every evening, Zimbleman thought that "at this age Grace needs stability. She is not able to comprehend the change of a home every week." Moreover, because of her emotional tie to her mother, "Grace would suffer by not seeing her mother all week." Zimbelman believed that "[b]y living with Teresa and going to

her father's for daycare, Grace's schedule is stable."

[¶ 10.] For child support purposes, the parties testified on their financial circumstances. Teresa is employed by Southeastern Behavioral Health and earns $8.44 per hour, forty hours per week. In addition, she provides personal assistance for a handicapped person, averaging seven hours per week, at $12 per hour. Teresa's annual income is $21,932. Travis is not employed. Annually, he receives $88,800 from his structured personal injury settlement. This averages $7,400 per month. Because of his disability, Travis incurs some extraordinary expenses, including the recurrent cost of a personal assistant and wheelchair repairs. At trial, he offered proof that for a six-month period, these expenses totaled $8,000.

[¶ 11.] The trial court awarded joint legal custody to the parents, naming Teresa as the primary physical custodian. In its ruling, the court considered our guidelines in *Fuerstenberg v. Fuerstenberg*, 1999 SD 35, 591 N.W.2d 798. For computing the amount of monthly child support, the court excluded $16,000 of Travis's annual structured settlement receipts and calculated child support as if Travis had a yearly income of $72,000. Travis was ordered to pay monthly child support of $938. In addition, he was allowed to bill Teresa or receive credit for 20% of the reasonable cost of daycare. The court directed Teresa to use the daycare provided in Travis's home, "insofar as he is willing to do so and insofar as he does so with sufficient reliability so as not to create a difficulty for [Teresa's] work attendance."

[¶ 12.] In this appeal, Travis raises the following issues: (1) "Whether the trial court's determination to grant physical custody to the mother was impermissibly influenced by Travis Arneson's physical disability?" (2) "Whether the trial court's

determination to grant physical custody to the mother was erroneously based on the 'tender years' doctrine?" (3) "Whether the trial court's findings supporting its physical custody determination are clearly erroneous, and whether the trial court abused its discretion in awarding physical custody to the mother?" (4) "Whether the trial court erred in considering the monthly payments from Travis's malpractice settlement as income for determining child support and past due support?" (5) "Whether the trial court abused its discretion in awarding attorney fees to the mother?" For continuity of analysis, we combine the first three issues.

## II.

### Custody Award

[¶ 13.] In deciding custody disputes between parents, "the court shall be guided by consideration of what appears to be for the best interests of the child in respect to the child's temporal and mental and moral welfare." SDCL 25-4-45; *Zepeda v. Zepeda*, 2001 SD 101, ¶ 13, 632 N.W.2d 48 (citing *Fuerstenberg*, 1999 SD 35, ¶ 22, 591 N.W.2d at 806). On appeal, we review a trial judge's decision for error in incorrectly choosing, interpreting, or applying the law; for clear mistakes in fact findings; and for undue emphasis on matters not materially related to the child's welfare. *Fuerstenberg*, 1999 SD 35, ¶ 35, 591 N.W.2d at 810. We expect that any decision will be balanced and methodical. *Id.* In considering the relevant evidence, courts should be cognizant of several "guiding principles." *Id.*, ¶ 23. These include parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, and separation of siblings. *See generally Fuerstenberg*, 1999 SD 35, ¶¶ 23-32, 591 N.W.2d at 806-10.

A court is not bound to make a specific finding in each category; indeed, certain elements may not apply in some cases, and, in others, there may be additional relevant considerations. In the end, our brightest beacon remains the best interests of the child.

*Zepeda*, 2001 SD 101, ¶ 13, 632 N.W.2d at 53 (citing *Fuerstenberg*).

[¶ 14.] It is a poignant reality that when parents contest the custody of their children, a court must make a choice. That choice is often difficult because between two loving parents there may be little to distinguish one over the other. Choosing between two satisfactory options falls within a judge's discretion. Thus, in our review of an ultimate decision on custody, we decide only whether the court abused its discretion. *Fuerstenberg*, 1999 SD 35, ¶ 22, 591 N.W.2d at 807 (citations omitted). Although we have repeatedly invoked stock definitions, the term "abuse of discretion" defies an easy description. It is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable. *See generally Adrian v. McKinnie*, 2002 SD 10, ¶ 10, 639 N.W.2d 529, 533 (citations omitted). This standard is the most deferential of appellate review standards, but that does not mean that a judge's custody decision will remain undisturbed. Rather, it is a recognition that trial courts are in a better position to make these difficult choices because the parents are present in the courtroom and the judge is better able to assess their capabilities firsthand.

[¶ 15.] Travis believes that the Americans with Disabilities Act (ADA) affords "protection from discrimination for persons with disabilities seeking custody of their children." For him, the spirit, if not letter, of the ADA precludes a trial court's presumption "that his limitations in physi-cal abilities prevent him from being fully capable in his parenting abilities." We acknowledge that with the ADA Congress issued a mandate of "comprehensive character." *PGA Tour v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 1889, 149 L.Ed.2d 904, 919 (2001). For a nation that values the full realization of potential for all its citizens, the ADA marks "a milestone on the path to a more decent, tolerant, progressive society." *Id.* (citing *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375, 121 S.Ct. 955, 968, 148 L.Ed.2d 866, 884 (2001) (Kennedy, J., concurring)). To accomplish "its sweeping purpose," the ADA prohibits discrimination against disabled persons "in major areas of public life[.]" *Id.*

[¶ 16.] Codified at 42 U.S.C. § 12111 *et seq.*, the ADA provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Under Title II of the ADA, a "qualified individual with a disability" means:

[A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). The ADA requires reasonable accommodation for limitations, not disabilities. *See Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 164

(5thCir.), *cert. denied,* 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996); 29 C.F.R. § 1630.9 app. at 362 (2003). Thus, employers, for example, "are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability. . . ." *Id.* at 363.

[¶ 17.] A person, such as Travis, who has cerebral palsy and requires the use of a wheelchair, is considered an individual with a disability for purposes of the ADA. *See Stalter v. Bd. of Co-op. Educ. Serv. of Rockland County,* 235 FSupp2d 323, 330 (S.D.N.Y.2002). In *Stalter,* the plaintiff qualified under the ADA because he had a mental or physical impairment, which affected a major life activity, and which substantially limited that major life activity. *Id. See also Martin v. Metro. Atlanta Rapid Transit Authority,* 225 FSupp2d 1362, 1376 (N.D.Ga.2002) (noting persons with cerebral palsy were clearly "disabled" for purposes of the ADA).

[¶ 18.] A "public entity" is defined as "[a]ny department, agency, or other instrumentality of a State or States or local government." 28 C.F.R. § 35.104(5)(2) (2001). A court has been considered a "public entity" for purposes of the ADA. *Galloway v. Superior Court,* 816 F.Supp. 12, 18 (D.D.C.1993) (court system is a "public entity" under the ADA and must provide reasonable accommodations for juror's visual limitations). For our case, however, no authority supports the extension of the ADA into parental custody disputes. Most cases concerning the application of the ADA in court proceedings deal with reasonable courthouse accommodations. *See Matthews v. Jefferson,* 29 FSupp2d 525 (W.D.Ark.1998) (county courthouse in violation of ADA by failing to make courthouse readily accessible to paraplegic); Ann K. Wooster, J.D., Annotation, *When Are Public Entities Required to Provide Services, Programs, or Activi-* *ties to Disabled Individuals Under Americans with Disabilities Act, 42 U.S.C.A. § 12132,* 160 A.L.R. Fed. 637 (2000). A custody proceeding is not a "service, program, or activity" under the provisions of the ADA. *In re Adoption of Gregory,* 434 Mass. 117, 747 N.E.2d 120 (2001) (proceedings to terminate parental rights are not "services, programs, or activities," under the ADA). We conclude that the ADA does not apply to this custody litigation.

[¶ 19.] Although the ADA is not applicable here, we stress that a physical disability is not a *per se* impediment to custody. This principle is well illustrated in another authority Travis cites: *Carney v. Carney,* 24 Cal.3d 725, 157 Cal.Rptr. 383, 598 P.2d 36 (1979). There, a decision on custody turned on the trial judge's stereotypical perceptions about the father's disability. *Id.* at 39–40. The father had custody of his two boys for almost five years during which time their mother never once visited them nor made any contribution to their support. *Id.* at 37. After the father became a quadriplegic resulting from an automobile accident, the mother sought a change in custody. *Id.* Equating disability with parental unfitness, the court transferred custody to her, basing its decision on the father's physical handicap and its presumed adverse effect on his capacity to care for the boys. *Id.* Rather than considering the deeper contributions the father made to his sons' lives, the judge puzzled over the father's inability to function with the boys in sports activities. *Id.*

[¶ 20.] In reversing, the *Carney* court pointed out that the trial judge became fixed on the father's disability and disregarded other important factors in making the decision. *Id.* at 39–40. The judge allowed assumptions about people with disabilities to control. *Id.* at 40–41. But the *Carney* court went on to explain:

We do not mean, of course, that the health or physical condition of the parents may not be taken into account in determining whose custody would best serve the child's interests. In relation to the issues at stake, however, this factor is ordinarily of minor importance; and whenever it is raised whether in awarding custody originally or changing it later it is essential that the court weigh the matter with an informed and open mind.

\* \* \*

[I]n all cases the court must view the handicapped person as an individual and the family as a whole.

*Id.* at 41–42.

[¶ 21.] We agree with the holding in *Carney.* Although the health and physical condition of a parent is a valid factor in determining a child's best interests, a judge must neither presume the existence of limitations nor fail to adequately consider other relevant factors. When faced with a parent's disability in a custody dispute, the judge should consider: (1) the person's actual and potential physical capabilities; (2) how the parent has managed and adapted to the disability; (3) how the other members of the household have adjusted to it; and (4) "the special contributions the person may make to the family despite, or even because of, the handicap." *Id.* at 42. Weighing these and other relevant factors together, the court should then decide what effect, if any, the parent's condition will have on the best interests of the child.

[¶ 22.] Here, unlike in *Carney,* the trial court took evidence on Travis's disability, but properly centered on the three *Fuerstenberg* elements most relevant in these circumstances: fitness, stability, and primary caretaker. Concerning the fitness factor, the court found that Teresa was more willing to "maturely encourage and provide frequent and meaningful contact between the child and the other parent." *Fuerstenberg,* 1999 SD 35, ¶ 24, 591 N.W.2d at 807. In addition, the court noted that Travis was living with a woman to whom he was not married. They eventually married during the pendency of this appeal, but, of course, the court could not have counted on that at the time. As to the stability factor, the court noted that both parents were equal. The court concluded that Teresa was Grace's primary caretaker and then concurred in Zimbelman's observation that at her present age, Grace needs to be with the one she is most emotionally attached to, Teresa.

[¶ 23.] Travis takes issue with Zimbelman's assessment of his limitations, especially her concerns about his ability "to respond to Grace in times of sickness or emergency." He insists that in so concluding, Zimbelman "let her stereotypical assumptions prevail." The trial court never found that Travis had such limitations. However, the court did find "the opinions and observations of the expert to be reasonable and well grounded and ... placed great weight upon them." Travis believes that Zimbelman should have tested his response times before coming to her conclusions about his ability to respond. But Zimbelman did observe Travis in his daily activities. As she stated in her report,

Travis demonstrated how he was able to move around the house and how he was able to care for Grace. He drove his wheel chair to the stairs and slid down the stairs to his bedroom.... Travis also demonstrated how he was able to get Grace a drink if she asked for one and how he was able to get something for her to eat or drink.

Only then did she express her concerns about his ability to respond in an emergency. Travis may take exception to her opinion, but this is not a case of discrimi-

nation, as Travis contends, by reliance on assumptions about a physical condition as prima facie evidence of parental unfitness. On the contrary, Zimbelman directly observed Travis's mobility in his home. By stipulation of the parties, Zimbelman was appointed by the court to perform a home study on each parent. If Travis felt that Zimbelman's assessment misrepresented his abilities, he could have brought in his own expert to contradict her.

[¶ 24.] Travis also contends that the court resurrected the "tender years" doctrine. He quotes the court's bench comments: "[B]ecause of the age of the child … the mother is the important one now. As the child gets older, as the discipline comes into it, discipline is necessary and so forth and guidance, perhaps things may change."[2] We do not ordinarily probe the court's oral pronouncements. In reviewing decisions, we look to the formal written findings. *Marks v. Clark*, 2001 SD 122, ¶ 12, 635 N.W.2d 278, 281; *Western Bldg. Co. v. J.C. Penney Co.*, 60 S.D. 630, 636–37, 245 N.W. 909, 911–12 (1932). Nonetheless, although we must base our review on the written findings, we acknowledge that these remarks sound as if the tender year's doctrine were still alive in the trial court's view. Yet, an examination of the entire fact findings does not bear out Travis's complaint. In commenting on tender years, the court was speaking primarily in the context of the child's emotional attachment to her mother, a matter on which Zimbelman gave her expert opinion. As Zimbelman said, small children are more emotionally attached for nurturing and security to their primary caretakers, whether male or female. At the same time, the trial court recognized that children's needs change over time, just as the South Dakota Visitation Guidelines envision. The court's written findings leave no doubt of this. Concluding that Teresa had been Grace's primary caretaker until the separation when Travis became more active, the court followed Zimbelman's recommendation that Grace needed "daily contact with her mother to [meet] her needs."

[¶ 25.] Lastly, Travis argues that the court registered a finding not borne out in the record: "More significantly, [the mother] has demonstrated great willingness to share the child with plaintiff whereas plaintiff tends to want to hang on to the child to meet his needs rather than focusing on the needs of the child." Concededly, there is scant evidence to support this finding. Yet, the question is not whether each finding can be linked to a page in the transcript, but whether the court could have reasonably reached this conclusion from the entirety of the evidence. Early in their separation, both parents had difficulty sharing custody of Grace at times. In ascribing fault, the court could well have decided that Travis bore greater responsibility. Travis resisted paying Teresa child support, wanted any child support he should have to pay in the future to be based on the minimum income level, and claimed under oath that the annual $88,800 he received tax free was actually his mother's, even though he received it and spent it as his own. Travis was twenty-eight at the time of trial, and his mother had been his guardian ad litem during his minority. She contradicted his latter contention, and

---

2. When it existed, the "Tender Years Doctrine" granted preference to mothers of children of "tender years." In 1979, our Legislature abrogated this doctrine. Before then, the law provided that, all things being equal, the mother was entitled to custody of a child of tender years. *Prentice v. Prentice*, 322 N.W.2d 880, 881–82 (S.D.1982). However, the law was amended so that now neither parent can be given preference in determining custody. *See* SDCL 25–4–45.

the judge specifically found that he had misrepresented his financial condition. The court also found that he was "highly resistant to providing monetary support, using the financial issues to attempt to coerce the custody issue...." Certainly, the court could conclude that these are not the acts of a father who puts the needs of his child first.

[¶ 26.] On the whole, the record does not reveal that the trial court's findings were clearly erroneous. We conclude that the court properly considered the relevant factors in making its custody determination and did not abuse its discretion in awarding primary physical custody to Teresa.

### III.

### Use of Structured Settlement in Calculating Child Support

[¶ 27.] In calculating child support, the circuit court included Travis's medical malpractice settlement funds, but deducted $16,000 for extraordinary expenses related to his disability. In reviewing a child support award, we look to see "whether the trial court abused its discretion in setting the support." *Peterson v.*

*Peterson*, 2000 SD 58, ¶ 13, 610 N.W.2d 69, 71 (quoting *Grode v. Grode*, 1996 SD 15, ¶ 7, 543 N.W.2d 795, 800 (citation omitted)). However, the question whether a source of funds constitutes income involves statutory interpretation, and that is a question of law reviewable de novo. *Bozied v. City of Brookings*, 2001 SD 150, ¶ 8, 638 N.W.2d 264, 268 (citation omitted). Travis argues that his settlement proceeds are not a source of income under SDCL 25–7–6.3.[3] The court concluded that these proceeds are periodic payments from an "insurance contract" under 25–7–6.3(3).

[¶ 28.] Although the circuit court was clearly right in holding that Travis receives periodic payments from an "insurance contract" under SDCL 25–7–6.3(3), there is more to this question than meets the eye. These payments are from a tax-exempt personal injury structured settlement.[4] As the court in *Western United Life Assurance Co. v. Hayden*, 64 F.3d 833, 839 (3rdCir.1995), explained:

> Structured settlements are a type of settlement designed to provide certain tax advantages.... [I]n a structured settlement the claimant receives periodic payments rather than a lump sum, and

---

**3.** SDCL 25–7–6.3 provides:

> The monthly net income of each parent shall be determined by the parent's gross income less allowable deductions, as set forth herein. The monthly gross income of each parent includes amounts received from the following sources:
> (1) Compensation paid to an employee for personal services, whether salary, wages, commissions, bonus, or otherwise designated;
> (2) Self-employment income including gain, profit, or loss from a business, farm, or profession;
> (3) Periodic payments from pensions or retirement programs, including social security or veteran's benefits, disability payments, or insurance contracts;
> (4) Interest, dividends, rentals, royalties, or other gain derived from investment of capital assets;
> (5) Gain or loss from the sale, trade, or conversion of capital assets;
> (6) Unemployment insurance benefits;
> (7) Worker's compensation benefits; and
> (8) Benefits in lieu of compensation including military pay allowances.
> If the income of the parents is derived from seasonal employment, or received in payments other than regular, recurring payments, such income shall be annualized to determine a monthly average income.

**4.** According to Travis's settlement agreement, the negligent physician's malpractice insurer funded the settlement by a "contract or contracts of insurance with Manufacturers Life Insurance Company of Toronto, Canada."

all of these payments are considered damages received on account of personal injuries or sickness and are thus excludable from income. Accordingly, a structured settlement effectively shelters from taxation the returns from the investment of the lump-sum payment.

*See also* IRC 104(a)(2); Pub. L. No. 97–473, Title K, § 101(b)(1), Jan. 12, 1983, 96 Stat. 2605 (1982) (codifying the tax-free status of such structured settlements provided by Revenue Rulings 77–230,79–220 and 79–313).

[¶ 29.] Our law partially defines gross income in terms of federal tax reporting. SDCL 25–7–6.6 provides:

> Gross income from a business, profession, farming, rentals, royalties, estates, trusts or other sources, are the net profits or gain, or net losses shown on any or all schedules filed as part of the parents' federal income tax returns or as part of any federal income tax returns for any business with which he is associated. . . .

In *Roberts v. Roberts*, 2003 SD 75, ¶ 18, 666 N.W.2d 477, 482, a case handed down a few months ago, we held that SDCL 25–7–6.6 does not establish "a separate category of parental income in addition to the general provisions of SDCL 25–7–6.3." In reading the two statutes together, we concluded that "if money received by a parent meets the criteria set by SDCL 26–7–6.3 and is also from certain specific sources identified by SDCL 26–7–6.6, then SDCL 26–7–6.6 provides further rules as to how to calculate that income." *Id.*

[¶ 30.] Travis's funds do indeed fall under one of the categories in SDCL 25–7–6.3, namely § 6.3(3), periodic payments. But these payments are neither profit nor gain as "shown on any or all schedules filed as part of the parents' federal income tax returns. . . ." SDCL 25–7–6.6. Nonetheless, our child support statutes do not provide exclusions for personal injury benefits, nor do they generally exclude nontaxable proceeds in figuring parental income for child support purposes.

[¶ 31.] The Nebraska Court of Appeals discussed the problem of the nontaxable nature of certain personal injury awards in *Mehne v. Hess*, 4 Neb.App. 935, 553 N.W.2d 482 (1996).

> [W]e are not persuaded by Mehne's argument that personal injury settlements should be ignored as an income source in determining child support because they are not considered as gross income by Internal Revenue Service laws. The taxability of moneys received provides no logical basis to necessarily include or exclude them from the category of resources available to pay child support. Such a general proposition would exclude such settlements, when in fact many represent compensation for lost wages or diminished earning capacity, which are pivotal considerations in setting child support under Nebraska law.

*Id.* at 487.

[¶ 32.] In disregarding the nontaxable status of these types of structured settlements in child support cases, several authorities have held that, in the absence of any legislative intent to exclude nontaxable parental income, periodic payments from an annuity, regardless of the annuity's source, will be included. *Sherburne County Social Serv. v. Riedle*, 481 N.W.2d 111, 112 (Minn.App.1992). In *Mower County Human Serv. v. Hueman*, 543 N.W.2d 682 (Minn.App.1996), the court ruled that two annuity contract payments received by a father as part of his childhood personal injury settlement constituted income for the purpose of establishing child support.

[¶ 33.] Likewise, in the case of *In re Marriage of Fain*, 794 P.2d 1086 (Colo. App.1990), the court ruled that payments

received through a personal injury structured settlement constitute gross income for calculating child support. The court wrote:

> Section 14–10–115(7)(a)(I)(A), C.R.S. (1987 Repl. Vol. 6B) provides that "gross income" includes "income from any source and includes, but is not limited to ..." the items specifically enumerated therein. Therefore, although social security benefits and disability benefits are expressly included as "gross income," § 14–10–115(7)(a)(I), by its plain language, also includes all payments from a financial resource, whatever the source thereof....
>
> While the General Assembly expressly excluded certain benefits from the definition of "gross income," ... the statute does not provide an exclusion for personal injury benefits.

*Id.* at 1087. Under Colorado's inclusive definition of "gross income," a parent's structured settlement payments are included for child support purposes. Similarly, our Court held in *Peterson* that the use of the word "include" in SDCL 25–7–6.3 suggests a legislative intent to encompass other unlisted sources of income.[5]

[¶ 34.] Even if the circuit court had not relied on SDCL 25–7–6.3, as an alternative, it could have fallen back on SDCL 25–7–6.5. That statute provides: "If a child's needs are not being met through the income of the parents, assets shall be considered. If the parents have savings, life insurance or other assets in amounts unrelated to income, these holdings shall be considered." Without his structured settlement funds, Travis has no money to support his child. Thus, his income is insufficient to meet his child's needs. His structured settlement payments can therefore be used as an "asset" to be considered for child support purposes. SDCL 25–7–6.5. Several jurisdictions have held that these settlements constitute a "financial resource" or "asset" to be included in a child support calculation. *See Genna Rosten, J.D., Annotation, Consideration of Obligor's Personal–Injury Recovery or Settlement in Fixing Alimony or Child–Support,* 59 A.L.R.5th 489 § 3 (1998). *See also Butler v. Butler,* 339 Pa.Super. 312, 488 A.2d 1141, 1143 (1985) (it would be illogical to rule that the tort award is available to pay debts to "the butcher, the baker, and the candlestick maker," but not debts for child support).

[¶ 35.] Because Travis's structured settlement payments are either income or an asset available for purposes of calculating child support, the next question is how much of these amounts should be included in the child support calculation? As previously mentioned, the trial court excluded $16,000 of Travis's annual payments for extraordinary expenses. Some jurisdictions only include that portion of the personal injury settlement proceeds that represent lost income and income capacity. *Villanueva v. O'Gara,* 282 Ill.App.3d 147, 218 Ill.Dec. 105, 668 N.E.2d 589 (1996); *In re Marriage of Durbin,* 251 Mont. 51, 823 P.2d 243 (1991); *In re Marriage of Gallegos,* 174 Ariz. 18, 846 P.2d 831 (Ct.App. 1992); *Mehne, supra; Whitaker v. Colbert,* 18 Va.App. 202, 442 S.E.2d 429 (1994); *Geyer v. Geyer,* 1992 WL 352642 (Ohio Ct.App.1992). Personal injury settlements often compensate for more than lost earnings and earning capacity. These awards also compensate for such things as disabili-

---

5. It should be noted that *Peterson* was a split decision on the question whether the Legislature intended to include as income other unlisted sources. However, since that decision of three years ago, the Legislature has not seen fit to amend this statute to correct this interpretation, although it has amended other portions of the child support statutes. Thus, we must conclude that the Legislature continues to embrace this interpretation.

ty and disfigurement; past and future pain and suffering; past and future medical expenses; and caretaking expenses. *See* South Dakota Pattern Jury Instructions 30–01, et seq. Here, however, because Travis maintained that none of his proceeds should be considered, he offered no suggestion on what part of his settlement was intended to replace income. And the settlement agreement itself does not specify a lost income component. It is simply a structured settlement, providing for payments beginning in 1992 and ending either in 2012 or at the end of Travis's life, whichever period is longer.

[¶ 36.] Counting all his funds as income for child support purposes may be unfair to Travis, though excluding all of it, as he requested, is clearly unfair to his child. If Grace lived with her father fulltime, she would enjoy his standard of living made possible by the use of these funds. With the limited information available to the trial court, it did its best to exclude those portions of the settlement necessary for Travis's basic care. Because Travis took the position that none of the settlement could be used for child support, he left the court with an all or nothing choice. On this record, we cannot say that the court abused its discretion in setting support using a portion of Travis's structured settlement proceeds. We affirm the child support award.

## IV.

### Award of Attorney Fees to Mother

[¶ 37.] SDCL 15–17–38 permits the award of attorney's fees in divorce actions. *Kappenman v. Kappenman,* 522 N.W.2d 199, 202 (S.D.1994). As we said in *Temple v. Temple,* 365 N.W.2d 561 (S.D.1985), each case rests on its own merits and in the court's discretion. In reviewing such awards, we will consider the totality of circumstances. *Pribbenow*

*v. Van Sambeek,* 418 N.W.2d 626, 630 (S.D.1988). The trial court considered the proper factors to determine the reasonableness of attorney's fees and whether either party ought to be required to contribute to the fees of the other. See *Kappenman,* 522 N.W.2d 199. In accord with *Ryken v. Ryken,* 461 N.W.2d 122 (S.D. 1990), the trial court considered the relative incomes of the parties to be significant in this case. After finding that Travis's income was almost four times Teresa's income, the trial court divided the burden accordingly, ordering that Travis pay 70% of Teresa's attorney fees, tax, and costs. In addition, the court also found that Travis should pay 80% of the home study cost. The court did not abuse its discretion.

## V.

### Appellate Attorney's Fees

[¶ 38.] Teresa requests appellate attorney fees of $2292.98 and costs of $246.80. In considering fees for the appeal, we must consider "the property owned by each party, their relative incomes, the liquidity of the assets and whether either party unreasonably increased the time spent on the case." *Barnes v. Matzner,* 2003 SD 42, ¶ 24, 661 N.W.2d 372, 379 (citation omitted). From the record, we know that Travis's annual payments total approximately $88,800 (non-taxable) and Teresa's annual income is approximately $22,000. Thus, Travis is in a significantly better position to pay attorney's fees. The second step of our analysis is to examine the fee requests from the perspective of whether the party's appellate arguments carried any merit. Considering this factor, Travis's appeal had some merit, especially the questions of first impression in South Dakota. Teresa asks for $2292.98, which appears to be appropriate for the work her attorney performed in defending the appeal. Yet, con-

sidering the merit of Travis's arguments, we award her $1,500.

[¶ 39.] Affirmed.

[¶ 40.] GILBERTSON, Chief Justice and ZINTER and MEIERHENRY, Justices, concur.

[¶ 41.] SABERS, Justice, concurs in part and concurs in result in part.

SABERS, Justice (concurring on Issues 1, 2, and 4 and concurring in result on Issue 3).

[¶ 42.] I concur in result on Issue 3 because Travis wholly failed to establish that the trial court abused its discretion in determining that his structured settlement was income under the child support provisions. As we noted in *Peterson,* SDCL 25–7–6.3 was intended to be inclusive and to "encompass other, unlisted sources of income." *Peterson,* 2000 SD 58 at ¶ 21, 610 N.W.2d at 72 (citing *Hautala v. Hautala,* 417 N.W.2d 879, 881 (S.D.1988) (additional citations omitted)).