# IN THE COURT OF APPEALS OF IOWA

No. 23-1495
Filed June 18, 2025

**CHARLEY NICOLE MARTIN,**
    Plaintiff-Appellant,

**vs.**

**JACOB ELIJAH CALLENDER,**
    Defendant-Appellee.
_____

    Appeal from the Iowa District Court for Cedar County, Stuart P. Werling, Judge.

    A mother appeals a physical-care and child-support order under Iowa Code chapter 600B (2021). **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

    Thomas J. Viner of Viner Law Firm PC, Cedar Rapids, for appellant.

    John C. Wagner of John C. Wagner Law Offices, P.C., Amana, for appellee.

    Considered without oral argument by Badding, P.J., and Langholz and Sandy, JJ.

**LANGHOLZ, Judge.**

Charley Martin appeals the district court's order on her petition to establish paternity, legal custody, physical care, and visitation regarding her five-year-old daughter with Jacob Callender. She challenges the court's placement of their daughter in their joint physical care, arguing that it was based on improper hearsay evidence and does not equitably consider their daughter's best interest. And she argues that the court erred in not awarding child support or attorney fees because it failed to consider all Callender's income and financial resources, including past and future payments from a substantial personal-injury settlement.

On our de novo review—giving due deference to the district court's advantage in assessing the parties and witnesses in person and without considering any of the challenged hearsay evidence—we agree with the court's decision to place their daughter in the parties' joint physical care. But Martin is correct that the district court failed to properly consider the income Callender will be receiving from his personal-injury settlement and all his available current assets—including those derived from his earlier settlement payments—in ruling on her requests for child support and attorney fees. And because the record lacks evidence of Callender's assets and ongoing financial needs, we cannot decide an equitable child-support or attorney-fee award ourselves. We thus reverse the district court's denial of Martin's requests for child support and attorney fees and remand for the court to consider both requests on a fully developed factual record. Given the inadequate record, we also remand the parties' requests for appellate attorney fees for the district court to consider their respective financial needs in light of all their available resources—including Callender's assets.

## I.     Background Facts and Proceedings

In 2017, Martin and Callender met at Lisbon Sauerkraut Days and started dating shortly after. About a year and a half later, Martin became pregnant. And in 2019, they became parents to a daughter, who is now six years old. Sometime after their daughter was born, Martin moved in with Callender—who lives with his parents on their rural Cedar County farm—for around one and a half years.

As their relationship worsened, Martin moved to her own home in Mechanicsville in January 2021. Two months later, she filed this case, seeking to establish paternity, legal custody, physical care, and visitation. A few days later, she also applied for a domestic-abuse protective order, alleging that Callender used force to take their daughter from her arms during a planned exchange. Callender disputes that he engaged in abuse. But he consented to the entry of a one-year protective order that also set a schedule for parenting time with his daughter. He said he did so because he had not seen their daughter for two weeks and worried about what Martin might allege at a contested hearing and thus weighed "the possibility of never seeing my daughter again or get[ing] her a couple of days a week until the temporary hearing." He thought that the court would then order a "50/50" parenting schedule.

But at the temporary matters hearing in this case, the court placed their daughter in Martin's physical care and continued the parenting schedule set in the consent order: two nights per week with Callender, alternating between Sunday evening to Tuesday evening and Saturday morning to Monday evening. The protective order expired by its terms without incident in March 2022. The physical-care placement and parenting schedule remained in effect at the time of trial.

Martin is thirty-seven years old and employed by the Cedar Rapids public schools. She earns about $48,000 annually. And she does not have significant assets beyond her home, cars, and IPERS pension.

Callendar is thirty-two and does not have traditional employment. In December 2011, he was severely injured by a semi-truck that veered into his lane and crashed head-on into his car. He suffered a fractured skull, a brain injury, broken ribs, crushed hips, broken femurs, injured knees, a fractured tibia, an ankle injury, a crushed foot, kidney failure, severe internal bleeding, gallbladder failure, skin grafts, and more—all because of this accident. He was in a coma for two weeks and hospitalized for forty-six days. Callender still faces significant daily challenges from his injuries, including constant nerve pain in his foot, joint pain, and a weakened leg.

Despite his injuries, Callender works for his parents on their farm. Rather than paying wages, his parents let him live rent-free in their home and pay for some of his expenses. He also works occasionally for others by farming or performing construction tasks but receives little, if any, pay. He has been performing major renovations on a nearby farmhouse that he hopes to live in. And Callender testified that his injuries have had "zero" effect on his ability to care for his daughter. Still, Martin did not contend that Callender is capable of greater employment or that he should have additional income imputed based on his earning capacity.

Callender entered into a substantial personal-injury settlement with several parties for his claims arising out of the accident. The settlement agreements include provisions that they are confidential absent a court order. But they were produced to Martin by order of the district court and subject to a protective order.

And they were offered by Martin and admitted as sealed exhibits. We discuss only those terms of the agreements that are necessary to resolve this appeal, respecting the settlement parties' desire for confidentiality but also the interests of Callender, Martin, and the public in understanding the factual basis and reasoning of our decision here.

Callender received most of his payments under the settlement in 2014. Because this was years before he and Martin even met, the precise amount originally received is immaterial. The settlement also provided Callender would receive two final payments of about $300,000 each in November 2024 and November 2025. Callender invested the cash he received so far from the settlement. But the record does not show the current value of Callender's assets.

Callender's affidavit of financial status omits any mention of his investment assets.[1] And at trial, whenever Martin tried to inquire into the assets, she was stopped by Callender and the district court. The court sustained Callender's objection to asking about the payments Callender would receive in 2024 and 2025 "out of concern and abundance of caution to protect the confidentiality of the settlement agreement so that the parties both do not suffer the loss of that settlement agreement by violating its terms." The court also rejected Martin's argument the payments were relevant to child support, reasoning "any payments

---

[1] Presumably, Callender was concerned about violating the confidentiality provisions of the settlement agreements. But such agreements cannot cloak his current assets from view, presenting a false impression of his financial status to Martin and the court. And now ten years after the receipt of the settlement payments, we fail to see how the value of his current assets could shed much light on the payments he originally received given the many variables that could have increased or decreased the value of his assets since then.

that come out of the settlement agreement, in this Court's opinion, would be . . . akin to bonuses, and the law regarding bonuses is that they have to be regular and predictable in order to be included in income for purposes of child support." The court explained that it could "take into consideration the fact that he has funds available to him from a settlement agreement," but it did not "want to know what those amounts are out of a concern that that disclosure would disqualify the settlement."

We do know that the value of the investments fluctuated—Callendar testified that he lost between $400,000 to $500,000 in 2022, that it "recovered some" in 2023, and that "[i]t's more than it was initially." We also know that Callender had taxable dividends income from the investments averaging about $24,000 annually in the three years for which Callender's tax returns were entered into evidence.[2] And he testified that he chose to reinvest all that income and took out a $400,000 line of credit secured by his investments for his financial needs. He used about $100,000 of the credit to buy an acreage with the farmhouse that he is renovating.

After the two-day bench trial in August 2023, the district court awarded the parties joint legal custody, placed their daughter in their joint physical care, and set a parenting schedule of alternating weeks. The court reasoned "that the best interests of [their daughter] is that she have maximum time in the presence of both parents now and going forward." The court acknowledged the incident leading to the protective order and other conflict between the parties. But it found that

---

[2] Callender had $31,382 of taxable dividends income in 2019, $14,469 in 2020, and $26,641 in 2022. His tax return for 2021 is not in the record.

Callender and Martin "can communicate effectively and respectfully" regarding their daughter and "[t]hey have been cooperative in her care, for the most part." And it found that Martin and Callender could co-parent with one another and could even do so "very successfully" "with a little effort from [Callender] to appropriately channel his anger and not involve [their daughter]" in any conflict.

On the issue of child support, the district court concluded that "no child support is payable by either party to the other at this time." The court found that the parties' annual incomes were identical—$48,000. To determine Callender's income, the court found that it was "reasonable to attribute" $23,000 "commensurate with the benefit he receives from his parents for free housing and food." And it found Callender's income from his personal-injury settlement "to be about $25,000." The court did not explain how it decided on either amount. The court then reasoned that "applying these incomes to the child support calculator as required by the Iowa Supreme Court results in a finding that no child support is payable"—though the court did not attach the guidelines worksheet to its order.

The district court also denied both parties' requests to award attorney fees without any fact-specific reasoning. Martin moved for reconsideration of only the court's physical-care ruling. The court summarily denied Martin's motion. And Martin now appeals.

## II.    Joint Physical Care

We review the district court's physical-care ruling in a custody and support order under Iowa Code chapter 600B (2021) de novo. *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010). "[W]e give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but are

not bound by them." *Id.* We do so because "the district court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024)*.* This advantage "greatly help[s]" the district court "in making a wise decision about the parties" and their children*. In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (cleaned up).

"Our overriding consideration is the best interests of the child."[3] *McKee*, 785 N.W.2d at 736. We are guided by the factors in Iowa Code section 598.41(3) and those discussed in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). When considering whether joint physical care is in the best interest of a child with two suitable parents, we especially focus on: (1) the "stability and continuity of caregiving"; (2) the ability of the parents to "communicate and show mutual respect"; (3) "the degree of conflict between [the] parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *In re Marriage of Hansen*, 733 N.W.2d 683, 696–99 (Iowa 2007). At bottom, we must "place the child[] in the environment most likely to bring [her] to health, both physically and mentally, and to social maturity." *Id.* at 695. And we must focus on "what is best for the *child*"—not what is fairest to the *parents*. *Id.*

As she did in the district court, Martin argues that the parties' daughter should have been placed in her physical care rather than in the parties' joint

---

[3] We apply the same best interest standard under chapter 600B as in dissolution proceedings. *See* Iowa Code § 600B.40(2) (providing that Iowa Code section 598.41 "shall apply" when "determining the visitation or custody arrangements").

physical care.[4]  But on our de novo review, giving appropriate deference to the district court's factual findings, we agree with its decision that joint physical care is in the daughter's best interest.  For starters, we see no reason to disagree with the court's assessment that both parents "are capable of providing a nurturing home environment."  So we focus on the *Hansen* factors in considering whether joint physical care is in the daughter's best interest.

Joint care will provide "stability and continuity of caregiving" here.  *Hansen*, 733 N.W.2d at 697.  True, the daughter was in Martin's physical care—and thus had more overnights with her than Callender—for the two years before trial.  But we also consider Callender's extremely limited and flexible work schedule that let him spend significant time focused on caregiving when the daughter was with him and the evidence of the daughter's strong bond with Callender that developed during their time together.  So we, like the district court, find that her interest is best served by the "maximum time in the presence of both parents" that joint care will provide.

We also agree with the district court's findings that "[g]enerally" the parties "communicate effectively and respectfully regarding" their daughter and "have been cooperative in her care."  While Martin highlights some of their lapses in effective communication and incidents of conflict—including the one leading to the unresisted protective order two years before trial—we do not second-guess the

---

[4] Martin also contends that the district court improperly considered hearsay evidence—Callender's testimony about statements their daughter allegedly made to him.  Since we see no sign the court relied on the challenged evidence and do not consider it in our de novo review, we do not decide whether it was admissible. *See In re Marriage of Anderson*, 509 N.W.2d 138, 142 (Iowa Ct. App. 1993).

district court's judgment after sitting through the trial that these incidents are outweighed by the other evidence that the parties "have shown an ability to co-parent." And finally, aside from some disagreement about preschool, it appears that the parties have been in general agreement about their approach to parenting and daily matters until now.

We thus affirm the district court's decision that joint physical care is in the daughter's best interest. We share the district court's assessment that if the parties can both focus on the needs of their daughter rather than any personal conflicts, "they can co-parent very successfully." And we hope, for their daughter's sake, they seize on this opportunity to both be involved in creating an environment to care for her physical, mental, and social development.

### III. Child Support

Martin next challenges the district court's decision not to order Callender to pay any child support, arguing mainly that the court failed to properly consider Callender's substantial personal-injury settlement.[5] That settlement includes both (1) payments that Callender received in 2014—before Martin and Callender had even met—that he then invested, and (2) two payments of about $300,000 each that Callender was scheduled to receive in 2024 and 2025—after the court's child-support ruling. We will separately address each of these aspects of the settlement

---

[5] Martin also briefly challenges the district court's imputation of $23,000 of income to Callender to account for "the benefit he receives from his parents for free housing and food" in exchange for his part-time work on their farm and makes a cursory argument that other income from odd jobs should have been included. But Martin fails to point to evidence supporting any specific higher amount of imputed income or any amount of reasonably expected income to be received from odd jobs. We thus defer to the district court's preferred fact-finding position and affirm the district court on these challenges.

in our de novo review of the district court's child-support ruling. *See Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005).

To decide a child-support award, a district court must start with the child-support guidelines. *See* Iowa Code § 598.21B(2)(c) ("There shall be a rebuttable presumption that the amount of child support which would result from the application of the guidelines prescribed by the supreme court is the correct amount of child support to be awarded."); *see also In re Marriage of Swan*, 526 N.W.2d 320, 325 (Iowa 1995). The guidelines calculation is based mainly on the parties' respective incomes. *See Markey*, 705 N.W.2d at 19; *see also* Iowa Ct. R. 9.14. The first step is determining a party's gross income. *Markey*, 705 N.W.2d at 19.

Gross income is defined under the guidelines as "reasonably expected income from all sources." Iowa Ct. R. 9.5(1). And the guidelines expressly exclude from the definition only "public assistance payments, the earned income tax credit, or child support payments a party receives."[6] Iowa Ct. R. 9.5(1)(b). Consistent with this broad definition, our supreme court has explained that "[t]he guidelines do not limit the definition of gross income to that income reportable for federal income tax purposes." *In re Marriage of Lee*, 486 N.W.2d 302, 305 (Iowa 1992). And it has thus held that nontaxable veterans' disability benefits are properly considered as income. *See id.* So too with respect to nontaxable workers' compensation benefits—even when received as a lump-sum settlement while the recipient was obligated to pay child support. *See Swan*, 526 N.W.2d at 325.

---

[6] The guidelines also expressly address how spousal-support payments received or paid are factored into gross income. *See* Iowa Ct. R. 9.5(1)(a). While most spousal support received is included in a party's gross income, *see id.*, reimbursement spousal support is not, *see* Iowa Ct. R. 9.5(1)(a)(3).

Given the broad definition of gross income under the text of the guidelines and past precedent, we agree with Martin that the two lump-sum payments Callendar was scheduled to receive under his personal-injury settlement in 2024 and 2025 are properly considered as gross income under the guidelines. They are not merely "reasonably expected," but virtually certain given the contractual obligation for them to be paid under the settlement agreement. Iowa Ct. R. 9.5(1). They are income to Callendar that he would receive during the time period for which the court is calculating his obligation to support his child. The settlement payors fall within the expansive scope of "*all* sources." *Id.* (emphasis added). And the payments are not "public assistance payments, the earned income tax credit, or child support payments." Iowa Ct. R. 9.5(1)(b).

This holding is also consistent with the weight of authority from other jurisdictions, especially those with similarly expansive definitions of income in their governing statutes or rules. *See, e.g.*, *Dupay v. Dupay*, 782 N.W.2d 42, 45 (N.D. 2010) (holding that lump-sum personal-injury settlement fell within "broad definition of gross income"); *In re State ex rel. Taylor*, 904 A.2d 619, 702–06 (N.H. 2006) (holding that lump-sum personal-injury settlement is gross income); *Arneson v. Arneson*, 670 N.W.2d 904, 914–16 (S.D. 2003) (holding that medical malpractice structured settlement payments were income and collecting cases from other jurisdictions); *see also Darby v. Darby*, 686 A.2d 1346, 1348–49 (Pa. Super. Ct. 1996) (holding that lump-sum personal-injury settlement is income and reasoning that because the whole settlement is available to the recipient and subject to any debts that "[i]t would, indeed, call into question the sanity of the law if this court were to rule that the tort award i[s] available to pay debts to the butcher,

the baker and the candlestick maker but not debts to appellant's child for support" (cleaned up)). *But see Dep't of Hum. Servs. v. Monty*, 704 A.2d 401, 403 (Me 1998) (holding that lump-sum settlement payments were not income under statute that required income to be "from any *ongoing* source" (emphasis added)).

In arguing that these payments should not be considered income, Callender relies heavily on the unpublished opinion *In re Marriage of Miller*, No. 09-0115, 2009 WL 2184833 (Iowa Ct. App. July 22, 2009). There, a panel of our court held that periodic payments received by the paying spouse under a wrongful-death settlement were not income. *See id.* at *5. But we do not find that unpublished opinion persuasive because it was decided before the guidelines added its current broad definition of gross income. *See id.* at *4 (noting that "gross income is not specifically defined in the guidelines" and thus looking to the "common meaning" and out-of-state precedent). And the settlement in that case—unlike here—was not for the personal injury of the paying spouse, so none of it could have been for "reimbursement for [the paying spouse's] disability or lost earnings."[7] *Id.* at *5.

---

[7] In noting this distinction, we are not deciding that a settlement must be replacement of income to be treated as gross income under the guidelines. *See Arneson*, 670 N.W.2d at 917 (discussing jurisdictions with such a rule). But where a settlement includes replacement of income because of the personal injury, that fact may make it especially appropriate to treat it as income or otherwise consider it in setting a child-support award. *See Swan*, 526 N.W.2d at 325 (recognizing that workers' compensation settlement "represent[ed] a replacement of income [the recipient] could otherwise have earned had he not been injured"). Here, because the settlement agreement providing for Callender's 2024 and 2025 payments describe them only as "damages on account of personal physical injuries or sickness within the meaning of Section 104(a) of the Internal Revenue Code of 1986, as amended" and does not expressly designate any part of the payments for pain and suffering or other categories unrelated to income replacement, we need not decide whether payments expressly for those purposes could be excluded from gross income.

We come to a different conclusion on the settlement payments that Callender received in 2014. Those one-time payments received nearly ten years before the August 2023 trial were not current income for Callender. Nor do they give any reasonable basis to expect similar future payments of a like amount. Rather, the proceeds from those payments still in Callender's possession are assets. Assets are not included in gross income under the guidelines. *See* Iowa Ct. R. 9.5(1); *In re Marriage of Will*, 602 N.W.2d 202, 206 (Iowa Ct. App. 1999) (noting that the guidelines calculation "is figured on income, not net worth").

But these decisions about gross income under the guidelines are not the end of the proper consideration of either aspect of the settlement. A court may vary from the guidelines calculation when it makes a written finding that following the guidelines "would be unjust or inappropriate" because "[s]ubstantial injustice would result to the payor, payee, or child[]" or because "[a]djustments are necessary to provide for the needs of the child[] or to do justice between the parties, payor, or payee under the special circumstances of the case." Iowa Ct. R. 9.11(1)–(2); *see also* Iowa Code § 598.21B(2)(d). Such a variance may often be appropriate "when one or both parties own substantial assets"—and it "is of particular importance" when those assets "could or should be income-producing." *State ex rel. Pfister v. Larson*, 569 N.W.2d 512, 515 (Iowa Ct. App. 1997) (affirming upward variance based on farm assets), *overruled on other grounds by In re Marriage of Belger*, 654 N.W.2d 902, 908–09 (Iowa 2002); *see also Will*, 602 N.W.2d at 206 (affirming upward variance from the guidelines when paying spouse had "substantial investments earning deferred income" in "a conservative investment plan"); *In re Marriage of Neddermeyer*, No. 07-1261, 2008 WL 375256,

at *4 (Iowa Ct. App. Feb. 13, 2008) (affirming upward variance from guidelines for paying spouse who was incarcerated with little income, reasoning that "[n]et income . . . is not the only basis for calculating a parent's support obligation" and the parents' ownership of "assets from which his child support obligation could be satisfied is an important consideration in determining his ability to pay").

Here, a strict application of the guidelines calculation may well result in substantial injustice to both parties and their daughter. *See* Iowa Ct. R. 9.11(1). Including an extra $300,000 in gross income for 2024 and 2025 when that income is part of a lump-sum settlement would likely unjustly inflate Callender's income in those years, leading to an award greater than necessary to support their daughter in those years and too high to be sustainable in later years.

Conversely, failing to consider the substantial assets that Callender currently has available to help support their daughter as a result of his settlement payments in 2014 would likely result in substantial injustice to Martin and their daughter. Without any traditional income, these assets appear to be the main way Callender supports himself—including through the line of credit secured by the assets. So adjusting the guidelines calculation to account for all the financial resources at Callender's disposal is necessary to provide for the needs of their daughter and to justly apportion the responsibility for those needs between Martin and Callender. *See* Iowa Ct. R. 9.11(2); *see also* Iowa Code § 598.21B(2)(b)(1) (requiring consideration of "the responsibility of both parents to support and provide for the welfare of the minor child" and "of a child's need, whenever practicable, for a close relationship with both parents").

In sum, a just child-support award under these circumstances must consider the two $300,000 payments Callender was scheduled to receive in 2024 and 2025 and his substantial current assets derived from the 2014 payments under his personal-injury settlement. Because the district court's award did not do so, it cannot stand.

That leaves the question of precisely how those assets and payments should be factored in to calculate the award. Following the lead of the supreme court in deciding how to factor in a lump-sum workers' compensation settlement, "[w]e think it is unwise to establish one rule to be applied in all cases." *Swan*, 526 N.W.2d at 325. "The appropriate treatment . . . depends on the circumstances of each case." *Id.*

Unlike that workers' compensation settlement—which was expressly tied to benefits for a 126-week period—Callender's settlement has no apparent structure to neatly guide apportioning it. *See id.* at 325–26. In some cases, courts have apportioned a lump-sum settlement across the entire period that the recipient has a minor child to support. *See Dupay*, 782 N.W.2d at 47; *Mehne v. Hess*, 553 N.W.2d 482, 488–89 (Neb. Ct. App. 1996). Other courts have apportioned a lump-sum settlement across the recipient's life expectancy. *See Taylor*, 904 A.2d at 624–26; *but see Mehne*, 553 N.W.2d at 489 (rejecting apportionment over entire working life as "an untenable result" and not "in the children's best interests" where it would have provided insufficient support). And still others have treated a lump-sum settlement as income only in the year it is received. *See Darby*, 686 A.2d at 1349–50. Indeed, other methods of considering a lump-sum settlement may also be appropriate—perhaps even including or excluding some of the assets or

income from the settlement—to do justice to the parties and serve the child's needs. *See Arneson*, 670 N.W.2d at 917.

Ideally, we would consider the facts of this case to demonstrate the appropriate way to consider them here. But we cannot do so because the record leaves too many critical questions unanswered. Despite Callender's obligations to provide a complete and accurate financial affidavit and Martin's repeated attempts to ask about his assets at trial, we do not know the value of his current assets or how they are invested. While we appreciate the district court's concern about the confidentiality provisions in the settlement agreements, those agreements are not a reason to refuse to consider highly relevant evidence of Callender's current assets—especially when the provisions permit disclosure upon a court order, which was granted here. Neither do we have any evidence from Callender about his long-term needs and plans to use those assets to support himself or provide any care for his injuries, nor any basis at all to decide whether a particular child-support award would thus be unjustly high under the circumstances.

So we must remand to the district court for reconsideration of the child-support award. On remand, the parties must have a chance to develop a full factual record of Callender's financial circumstances, including his assets. The district court can then consider the full circumstances of this case to decide what "[a]djustments are necessary" to the guidelines calculation "to provide for the needs of" their daughter and "do justice between the parties." Iowa Ct. R. 9.11(2).

We thus reverse the district court's child-support ruling and remand for further proceedings consistent with this opinion.

## IV.    Trial and Appellate Attorney Fees

Martin also appeals the district court's denial of her request for trial attorney fees. And both parties ask that we award them appellate attorney fees. The district court has discretion whether to award the prevailing party attorney fees in a chapter 600B proceeding. *See* Iowa Code § 600B.26 ("In a proceeding to determine custody or visitation . . . under this chapter, the court may award the prevailing party reasonable attorney fees."). Among other factors, the court must consider the parties' respective abilities to pay. *See Markey*, 705 N.W.2d at 26. We review the district court's decision whether to award fees for abuse of discretion. *See id.* at 25. We also have discretion to award appellate attorney fees to the prevailing party. *See id.* at 26. In exercising that discretion, we similarly consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (cleaned up).

Because the district court prevented the submission of evidence about Callender's assets, it could not properly consider his ability to pay an attorney-fee award. Nor do we have an adequate record to exercise our discretion whether to award appellate attorney fees. We thus reverse the district court's denial of Martin's requests for trial attorney fees and remand for the district court to consider that request and both parties' requests for appellate attorney fees on a fully developed factual record of their respective financial needs in light of all their available resources—including Callender's assets

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.