#27238-a-DG

**2015 S.D. 86**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ANNETTE MACKABEN,                                      Plaintiff and Appellee,

   v.

EVERETT THOMAS MACKABEN, JR.,            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JEROME A. ECKRICH, III
Judge

\* \* \* \*

PATRICIA A. MEYERS
Rapid City, South Dakota                    Attorney for plaintiff
                                                              and appellee.


KYLE KRAUSE
Rapid City, South Dakota                    Attorney for defendant
                                                              and appellee.


\* \* \* \*

CONSIDERED ON BRIEFS
ON AUGUST 31, 2015

OPINION FILED **11/04/15**

# 27238

GILBERTSON, Chief Justice

[¶1.] On August 15, 2014, the circuit court granted a divorce to Everett Thomas MacKaben Jr. (Tom) and Annette MacKaben because of irreconcilable differences. In dividing the property, the circuit court determined that a sizable tax lien on the marital home was Tom's nonmarital debt. The court also awarded spousal support of $1,000 per month to Annette for a period of 10 years to follow the sale of the marital home. Tom appeals, asserting that the circuit court abused its discretion in assigning him sole responsibility for most of the tax lien, in not specifying that the spousal support terminates in the event of his own death, and in setting the amount and duration of the support award. We affirm.

## Facts and Procedural History

[¶2.] Tom and Annette met in 1999 and married on September 18 of that year. At the time of trial, Tom was 53 years old and Annette was 45 years old. The parties have one child together, who was 13 years old at the time of trial. Tom has a high-school-level education and was largely self-employed during the marriage. He owned and operated a small construction company called Bear Paw Construction and sometimes served as a hunting guide. Annette has a Bachelor of Science degree in animal science from South Dakota State University. Aside from Tom recovering from surgery on his bicep, the parties were otherwise in good health at the time of the divorce. Although Annette worked outside of the home for a short time after the marriage, Tom successfully encouraged Annette to discontinue her employment in order to assist in his construction business by tracking financial information and records.

[¶3.]     The parties struggled financially from the beginning of the marriage. Tom came into the marriage with existing child-support obligations and owing $40,000 to his previous wife. More importantly, however, Tom did not reliably keep accurate business records, nor was Annette able to do the bookkeeping. The parties did not timely file income-tax returns from 2000 to 2006. They filed their 2005, 2006, and 2007 returns in 2007 after they sought to refinance the debts on the marital home. The parties eventually filed their 2003 and 2004 returns as well. During this time, Tom accumulated several judgments against his construction business, including one default judgment, and failed to pay excise taxes. Annette's mother loaned the parties $20,000 to satisfy and settle one of these judgments. Without Annette's knowledge, Tom also incurred a significant amount of credit card debt and allowed the parties' medical insurance to lapse, resulting in a large, uninsured medical debt for their child.

[¶4.]     By 2011, the parties' economic situation had deteriorated to such an extent that they sought out Consumer Credit Counseling Services (CCCS). CCCS obtained a credit report on the parties, and Annette first learned that their personal tax returns had not been filed for three tax years and that the Internal Revenue Service (IRS) had placed a tax lien on their home totaling nearly $50,000.[1] However, because the IRS was not actively pursuing repayment of the debt, the parties decided to focus their available funds on paying down their short-term obligations first. Over the subsequent year and a half, the parties' short-term debt

---

1.     By the time parties submitted their briefs for this appeal, the current pay-off amount for the tax lien was $55,504.

was reduced to approximately $3,000. During this time, the parties' income increased significantly because Tom went to work as an equipment operator at a coal mine in Wyoming. Although Tom put in substantial overtime, on his days off he continued to take on small construction projects and guide hunting groups.[2] The parties' tax returns have been timely filed since Annette assumed control of the parties' finances in 2011.

[¶5.] Annette filed for divorce in December 2013. Thereafter, the parties separated, and Tom stopped living at the marital home. The parties agreed that they would share legal custody of their child, that Annette would have primary physical custody, and that Tom would get reasonable and liberal visitation. The parties also agreed to sell the marital home. Tom continued paying the monthly mortgage, insurance, and tax payments on the home; the monthly payment to CCCS; Tom's business insurance; and the parties' health insurance. The parties also agreed on the division of personal property and non-IRS debts. Additionally, Tom has been making $500 payments to the IRS every month under a debt-repayment plan.

[¶6.] After the parties separated, Annette initially worked part-time driving a school bus, but later found full-time employment as a paraprofessional with the Meade County School District. Annette has also received additional training

---

2. Tom claimed that the money he earned as a hunting guide was only enough to cover his own expenses. When asked whether he reported this income on the parties' tax returns, Tom asserted his 5th Amendment right to remain silent.

enabling her to drive charter busses during the summer months and for school trips.

[¶7.] The circuit court granted each of the parties a divorce on the grounds of irreconcilable differences on August 15, 2014. The court adopted the parties' own personal-property division but ordered Tom to pay $10,000 to Annette in order to equalize the division. As for the marital home, the court ordered that it be sold. However, the court concluded that while the underlying tax liability was a marital debt, the interest and penalties were Tom's nonmarital debt. As a result, the court ordered Tom to pay $22,187 to Annette after the sale of the home; that any proceeds remaining after paying the mortgage, costs of sale, and tax lien go toward satisfying this award; that Tom receive any additional proceeds totaling up to $5,000; and that any remaining proceeds be shared equally. The circuit court also ordered Tom to continue paying $2,500 per month to cover the mortgage, insurance, and property tax on the home. Finally, the court ordered Tom to pay Annette $1,000 per month in spousal support for a period of 10 years following the sale of the home.

[¶8.] Tom raises seven issues on appeal. Additionally, Annette requests appellate attorney fees.

1. Whether the circuit court's findings of fact, conclusions of law, and decree are only entitled to limited deference.

2. Whether the circuit court was required to specify whether Tom's spousal-support obligation terminates upon his death.

3. Whether a spousal-support obligation that extends past the death of the obligor is an abuse of discretion.

4. Whether the circuit court abused its discretion by determining that the interest and penalties on the parties' IRS tax liability was Tom's nonmarital debt.

5.    Whether the circuit court abused its discretion by ordering Tom to pay all mortgage, insurance, and property-tax payments on the marital home until its sale.

6.    Whether the circuit court's decree effectively executed its division of the parties' IRS debt.

7.    Whether the circuit court abused its discretion in determining the amount and duration of spousal support.

8.    Whether Annette should be awarded appellate attorney fees.

## Standard of Review

[¶9.]    We review a circuit court's division of property for abuse of discretion. *Huffaker v. Huffaker*, 2012 S.D. 81, ¶ 11, 823 N.W.2d 787, 790. We also review a circuit court's spousal-support determinations for abuse of discretion. *Hagedorn v. Hagedorn*, 2012 S.D. 72, ¶ 9, 822 N.W.2d 719, 722. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850 (quoting *Arneson v. Arneson*, 2003 S.D. 125, ¶ 14, 670 N.W.2d 904, 910). "Pursuant to an abuse of discretion standard of review, factual determinations are subject to a clearly erroneous standard." *Id.* ¶ 8, 855 N.W.2d at 850 (quoting *State v. Guthrie*, 2002 S.D. 138, ¶ 5, 654 N.W.2d 201, 203). However, the circuit court's conclusions of law are reviewed de novo. *Id.*

## Analysis and Decision

[¶10.]    ***1.    Whether the circuit court's findings of fact, conclusions of law, and decree are only entitled to limited deference.***

[¶11.]    Tom asserts that the circuit court's findings of fact, conclusions of law, and divorce decree are only entitled to limited deference because they were all

drafted by Annette's counsel. In support of this assertion, Tom offers a single dissenting opinion stating: "[W]e cited with approval a case suggesting that appellate courts should scrutinize more carefully and give less weight to findings prepared by counsel than those findings prepared by trial judges themselves." *Kreps v. Kreps*, 2010 S.D. 12, ¶ 48, 778 N.W.2d 835, 848 (Konenkamp, J., dissenting). According to Tom, the circuit court altered only a single finding of fact, added one conclusion of law, and omitted Annette's proposed conclusions of law regarding attorney fees.

[¶12.] We decline Tom's invitation to hold that findings and conclusions prepared by a party at the court's request are only entitled to limited deference as a general rule. SDCL 15-6-52(a) specifically empowers a circuit court to "direct counsel for the prevailing party to prepare findings[.]" After the opposing party has been given an opportunity to respond to the proposed findings, "the court shall make or enter such findings and conclusions as may be proper." SDCL 15-6-52(a). The opposing party is free to argue on appeal that a particular finding or conclusion is improper. As indicated above, *see supra* ¶ 9, we already review a circuit court's conclusions of law de novo—i.e., they receive *no* deference on appeal. *Gartner*, 2014 S.D. 74, ¶ 8, 855 N.W.2d at 850. Tom offers no compelling reason for us to abandon our well-established standards of review regarding a circuit court's findings of fact (clearly erroneous) or decisions in property division and spousal support (abuse of discretion).

[¶13.] **2. *Whether the circuit court was required to specify whether Tom's spousal-support obligation terminates upon his death.***

[¶14.]     Next, Tom asserts the circuit court should have specifically addressed whether Tom's spousal-support obligation terminates in the event that his death occurs prior to the conclusion of the 10-year obligation.  However, this issue is not ripe for review.[3]  "Ripeness involves the timing of judicial review and the principle that judicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote." *Meinders v. Weber*, 2000 S.D. 2, ¶ 39, 604 N.W.2d 248, 263 (quoting *Boever v. S.D. Bd. of Accountancy*, 526 N.W.2d 747, 750 (S.D. 1995)). "Courts should not render advisory opinions or decide moot theoretical questions when the future shows no indication of the invasion of a right." *Boever*, 526 N.W.2d at 750.  However, "[a] matter is sufficiently ripe if the facts indicate imminent conflict." *Id.*  Here, the circuit court awarded Annette spousal support to run for a period of 10 years following the sale of the marital home.  As indicated above, Tom was healthy and only 53 years old at the time of the divorce proceedings.  Although it is not known when a third party will purchase the home, there is nothing in the

---

3.     Although Annette did not raise this argument, a dispute is not justiciable unless it is ripe. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732, 118 S. Ct. 1665, 1670, 140 L. Ed. 2d 921 (1998); *see also Brendtro v. Nelson*, 2006 S.D. 71, ¶ 12 n.1, 720 N.W.2d 670, 674 n.1.  Whether a controversy is justiciable may be considered by a court on its own motion. *See Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808, 123 S. Ct. 2026, 2030, 155 L. Ed. 2d 1017 (2003); *Baldwin Cty. v. Palmtree Penthouses, Ltd.*, 831 So. 2d 603, 605 & n.4 (Ala. 2002); *Kapuwai v. City & Cty. Of Honolulu, Dep't of Parks & Recreation*, 211 P.3d 750, 757 (Haw. 2009); *W.B. v. Commonwealth, Cabinet for Health & Family Servs.*, 388 S.W.3d 108, 115 (Ky. 2012); *Brickley v. Horton*, 951 A.2d 801, 802 (Me. 2008); *Wilson v. State Highway Comm'n*, 370 P.2d 486, 488 (Mont. 1962); *Appeal of Buckeye Power, Inc.*, 330 N.E.2d 430, 431 (Ohio 1975) (per curiam); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *Williams v. Univ. of Utah*, 626 P.2d 500, 503 (Utah 1981); *Daniels v. Mobley*, 737 S.E.2d 895, 899 (Va. 2013).

record to suggest that Tom's death is imminent, absent some unforeseen accident. In such an event, Tom's estate is free to petition for a modification.

[¶15.]     **3.     Whether a spousal-support obligation that extends past the death of the obligor is an abuse of discretion.**

[¶16.]     We do not reach this issue because of our decision on Issue 2.

[¶17.]     **4.     Whether the circuit court abused its discretion by determining that the interest and penalties on the parties' IRS tax liability was Tom's nonmarital debt.**

[¶18.]     The circuit court attempted to divide the marital estate into equal shares with the exception of the portion of the parties' IRS debt attributable to interest and penalties. While the court equally divided the underlying tax liability due the IRS, the court determined that the penalties and interest accumulated as the result of prior failures to file tax returns constituted a nonmarital debt attributable solely to Tom. Tom asserts the circuit court abused its discretion by assigning Tom sole responsibility for the penalties and interest. Specifically, Tom asserts the circuit court erred in three ways: (1) by failing to give sufficient weight to Annette's treatment of the parties' tax problem, (2) by basing its decision on erroneous findings, and (3) by attributing all payments made on the parties' IRS debt to principal.

[¶19.]     Tom first asserts that the circuit court failed to give sufficient weight to Annette's treatment of the parties' tax problem. The circuit court found that in 2011, after attending credit counseling, Annette learned that the parties' income-tax returns had not been filed for three previous tax years and that the marital home had been encumbered by a tax lien of nearly $50,000. Although Tom

acknowledges that "Annette's testimony provides some basis in the record for that finding[,]" he argues that "if Annette really was unaware of any issue, it could only be because she willfully stuck her head in the sand[.]" According to Tom, Annette should have realized the parties had a tax problem because Annette testified she believed the parties had been granted extensions for previous tax years, including an eight-year extension for the 2000 return; because the parties filed six tax returns at once in 2008; because Annette was generally aware of the parties' financial difficulties throughout the marriage; and other miscellanea. Additionally, Tom points out that after both parties learned of the problem, they allowed their outstanding tax liability to continue accruing interest and penalties for over a year before taking any steps to directly address the tax lien.

[¶20.] An appeal is not an opportunity to simply relitigate credibility determinations. "We give deference to the [circuit] court on judging the credibility of the witnesses and weighing their testimony." *Hill v. Hill*, 2009 S.D. 18, ¶ 26, 763 N.W.2d 818, 826. Any "[d]oubts about whether the evidence supports the [circuit] court's finding of fact are to be resolved in favor of the successful party's version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action." *Gartner*, 2014 S.D. 74, ¶ 8, 855 N.W.2d at 850 (quoting *Estate of Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d 219, 222). During the divorce proceedings, under cross-examination by Tom's counsel, Annette testified as follows:

> **[Tom's Counsel]**: Now, at some point did you become aware of a rather large debt to the IRS?
>
> **[Annette]**: Yes.
>
> **[Tom's Counsel]**: How did you become aware of that debt?

> **[Annette]**: When we took Tom's credit cards to consumer credit that first meeting with them, of course she had to run a credit score on both of us. And she walked back in and handed the credit scores to us and pointed to it, and that was the first time that I knew of any of it. I just remember looking at Tom and him just stating "Yes. I knew about it."
>
> . . . .
>
> **[Tom's Counsel]**: And so that would have been the first time you learned about a tax lien that was filed in December of 2009?
>
> **[Annette]**: Yes.
>
> . . . .
>
> **[The Court]**: I have a quick question . . . . My question is: When you went to the credit counselor, that's when you first learned [of the tax lien]?
>
> **[Annette]**: Yes.
>
> **[The Court]**: When was that?
>
> **[Annette]**: That would have been February of 2011.

The circuit court was not required to disbelieve Annette's testimony simply because Tom concludes she should have known better. While the content of Tom's assertions provides circumstantial evidence that might help prove Annette's awareness of a tax problem at the trial level, Tom has not proved by "a clear preponderance of the evidence" that Annette was aware of the parties' tax problem. *See id.* (quoting *Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d at 222). Because Tom has fallen short of leaving us "with a definite and firm conviction that a mistake has been committed[,]" *id.* (quoting *Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d at 222), we are not persuaded that the circuit court "failed to give sufficient weight" to Annette's treatment of the parties' tax problem.

[¶21.]     Next, Tom asserts that the circuit court's finding that Annette's efforts after learning of the tax lien "set[] the stage for a return to solvency" is clearly erroneous. According to Tom, "[t]he primary thing that set the stage for the family's

financial solvency was not Annette preparing tax returns, but rather the fact that Tom started working the coal mine in 2011 and earned a higher and more consistent income than at any other time during the marriage." We fail to understand how this finding, even if erroneous, undermines the circuit court's conclusion that the interest and penalties on the unpaid tax liability was Tom's nonmarital debt. The circuit court determined the interest and penalties on the unpaid debt was nonmarital because Tom was responsible for the imposition of those amounts, not because of Annette's role in remedying the situation.

[¶22.] Finally, Tom asserts the circuit court erred by attributing all payments made on the parties' IRS debt to principal. The parties initially owed the IRS an unpaid tax liability of $33,455. This tax liability generated an additional $44,376 in interest and penalties. However, the parties were credited with $23,661 in payments to the IRS. The circuit court applied the entirety of this credit toward the $33,455 underlying tax liability, leaving the interest and penalties unaffected. According to Tom, "Annette should be responsible for half of the interest accumulated on the unpaid taxes, even if penalties and interest on the penalties are made Tom's responsibility." Thus, the essence of Tom's argument is that the circuit court abused its discretion by categorizing the interest and penalties on the IRS tax liability as Tom's nonmarital debt. We disagree that the circuit court abused its discretion in this regard.

[¶23.] The Nebraska Supreme Court decided a substantially similar case in *Meints v. Meints*, 608 N.W.2d 564 (Neb. 2000). In *Meints*, over the course of seven years, a "husband incurred a federal income tax liability of $19,162.31, plus an

additional $11,235.36 in statutory penalties for late filing, for a total Internal Revenue Service (IRS) liability amounting to $30,397.67." *Id.* at 567. During those same years, "the husband and the wife filed separate income tax returns." *Id.* However, the husband testified—and the wife did not dispute—that he "spent the funds that he failed to withhold from his income for IRS tax purposes on family expenses[.]" *Id.* Consequently, the "district court did not treat the tax liability incurred by the husband as a marital debt and proceeded to divide the remaining marital estate accordingly." *Id.* at 566. On appeal, the Nebraska Supreme Court noted that "[i]ncome tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus . . . should generally be treated as a marital debt." *Id.* at 569. When "taxes are overdue, the principle behind the rule is the same, and the underlying tax liability [is] ordinarily . . . a marital debt." *Id.* However, the court also noted that even underlying tax liability need not be classified as marital debt "if credible evidence establishes that the delinquent tax-paying spouse spent significant funds on nonmarital pursuits." *Id.* As an extension of these principles, the court held "that an innocent spouse who has filed separate tax returns, and paid his or her taxes in a timely fashion, should not be forced to share in any statutory penalties for the late filings of a dilatory spouse." *Id.* Consequently, the court concluded that while the underlying tax liability was properly considered a marital debt, the accrued interest and penalties were nonmarital debt "solely attributable to the husband's late filings." *Id.*

[¶24.]     Although the facts of the present case are not identical to those presented in *Meints*, we think they are sufficiently analogous to apply the same

principles. Like the Nebraska Supreme Court, the circuit court here concluded the underlying tax liability was a marital debt while the accrued interest and penalties were Tom's nonmarital debt.[4] The circuit court so found for the following reasons:

> (1) If Defendant had . . . timely paid the taxes, then interest and penalties would not have accrued. The IRS wouldn't have a lien on the marital property and Plaintiff would realize more hard cash from the sale of the home.

> (2) Defendant was the person responsible for . . . paying the taxes.

> (3) The Defendant concealed his dereliction from his wife. She had no knowledge that Defendant failed to pay income taxes.

> (4) Upon discovery of the Defendant's deep dereliction, Plaintiff—with the help of Defendant's accountant—worked through a garbage bag full of records to recreate the delinquent tax years. As a result, returns were filed, thus setting the stage for a return to solvency.

> (5) The IRS lien was a function of Defendant's character—a tendency to profligacy and financial neglect.

Additionally, the circuit court also found that "Tom's failure to file income taxes was willful as well as negligent and as a result the parties incurred a significant amount of penalties and interest that they should not have incurred had Tom managed their financial affairs properly." Tom has not convinced us that the circuit court clearly erred in its relevant factual findings. Therefore, like the Nebraska Supreme Court in *Meints*, we must likewise conclude that Annette is "innocent" and should not suffer the consequences of Tom's concealed mismanagement of the family's finances—i.e., the interest and penalties portion of the tax lien.

---

4.   Although Annette initially attempted to convince the circuit court to categorize the entire tax lien as Tom's nonmarital debt, she has not made the same argument on appeal. Therefore, it is undisputed that the circuit court properly categorized that portion of the tax lien representing the parties' underlying tax liability, which does not include interest and penalties, as marital debt.

[¶25.] In light of the foregoing, the circuit court's application of the parties' $23,661 credit was proper. Tom has not asserted that any portion of this credit was paid out of his nonmarital funds. Therefore, it was proper for the circuit court to apply half of the credit toward each of the parties' shares of the underlying tax liability and then equally divide the remaining tax liability between the parties.[5]

[¶26.] ***5.*** ***Whether the circuit court abused its discretion by ordering Tom to pay all mortgage, insurance, and property-tax payments on the marital home until its sale.***

[¶27.] Tom asserts that the mortgage, insurance, and property-tax payments on the marital home should have been proportional to the allocation of the asset between the parties. Although the circuit court ordered Tom to make the foregoing payments on the home, the court ordered the first $5,000 of any net proceeds obtained from the sale of the home to be paid to Tom and any remaining proceeds to be equally divided between the parties. Annette argues that she remained equally obligated on the debt even though the circuit court "simply ordered Tom to pay the entire mortgage" instead of having "Tom pay half of the mortgage debt and Annette pay half of the mortgage debt with alimony that Tom paid to her[.]"

---

5. Annette was actually required to pay a small portion of the interest. The court calculated Annette's remaining share of the underlying tax liability at $5,564. This amount reflects half of the difference between the tax-lien-payoff-statement amount ($55,504) and the sum of the penalties ($15,516) and interest ($28,860). However, Tom's exhibit JJ indicated the payoff amount of $55,504 was higher than the calculated total of $54,170 ($33,455 in unpaid taxes plus $15,515 in penalties plus $28,860 in interest minus $23,661 in payments) because of additional interest that had accrued. Therefore, Annette should have only been responsible for $4,897—i.e., half of the difference between the unpaid taxes ($33,455) and the credit ($23,661).

[¶28.]　　　　As Tom points out, we reviewed an analogous property division in *Foley v. Foley*, 429 N.W.2d 42 (S.D. 1988).  In *Foley*, a husband and wife divorced, and the circuit court ordered the husband to make monthly payments of $518 for "the house payment, consisting of principal, interest and insurance" and $176 "for utilities, food, and necessaries[.]"  *Id.* at 43.  The court did not identify whether it considered these payments a portion of the property settlement or an award of spousal or child support, but the awards were set to terminate upon the later occurrence of the parties' youngest child reaching age 18 or finishing high school.  *Id.* at 43-44.  While the court determined that the parties would retain joint title to the marital home, the court decided the wife would receive 70% of the net proceeds from the sale of the home and the husband would receive the remaining 30%.  *Id.* at 44.  The court ordered the home be sold if the wife remarried or upon the later occurrence of the parties' youngest child reaching age 18 or finishing high school.  *Id.*  After the home was eventually placed on the market for sale, the wife petitioned for modification, which the circuit court granted.

[¶29.]　　　　On appeal of the modification, we commented on the circuit court's distribution of the mortgage and insurance payments.  We said:

> It is . . . clear that unless the mortgage payments were made, the property could have been foreclosed upon preventing either party from receiving any possible gain on the sale of the home. Although the trial court was justified in requiring [h]usband and [w]ife to share these payments, the percentages should have reflected the percentage interest of each party in the asset (or liability).  To require [h]usband to pay an additional twenty percent would be permissible only if such payments were part of [h]usband's continuing support obligation to [w]ife.

*Id.* at 47.  Consequently, we remanded to give the circuit court an opportunity either to reimburse the husband for the additional 20% of the mortgage and

insurance payments he had paid or to clarify that the additional sum was an award of spousal support rather than a property division.

[¶30.]     We think *Foley* is inconsistent with the discretion given to circuit courts to equitably divide marital property in divorce proceedings. *Foley* itself was a split decision, and it appears that we have never relied on *Foley* for the notion that a party's responsibility for preventing foreclosure on the marital home must be proportional to that party's interest in the asset. Such a rule ignores the equity court's larger function of dividing the total of marital property. A court is not required to equally divide each individual asset; rather, the overall division of the entirety of the marital assets must be equitable. To the extent that *Foley* suggests otherwise, it is overruled. In light of the larger property division, requiring Tom to pay an extra $1,250 per month to preserve the one asset that would be used first to satisfy his tax debt to the IRS was not an abuse of discretion.

[¶31.]     ***6.     Whether the circuit court's decree effectively executed its division of the parties' IRS debt.***

[¶32.]     In addition to disputing the circuit court's categorization of the interest and penalties as his nonmarital debt, Tom asserts "the manner in which the [c]ircuit [c]ourt attempted to accomplish this goal fails in its purpose because it does not account for the likelihood that the parties would make payments on the debt before the sale of their home." According to Tom, "[a]ny findings regarding the amount of proceeds from the home sale that will go towards the IRS lien are clearly erroneous" because the circuit court could not have known whether and by how much the tax lien would change by the time of sale. Tom asserts that he has been making $500-per-month payments on the tax lien under a settlement agreement

with the IRS. Thus, Tom concludes that "[t]o properly accomplish the objective of making [him] responsible for $44,375 of the IRS debt, it is necessary to use a formula that accounts for payments on the debt made by each party before the home sells." We disagree.

[¶33.]    Tom ignores the larger picture of the entire property division. Tom's burden on appeal is not to prove merely that one aspect of the actual property division deviated from the circuit court's intended property division. Rather, Tom must convince us that the property division, as executed, was an abuse of discretion. Although a circuit court must "have regard for equity and the circumstances of the parties" when dividing the marital estate, SDCL 25-4-44, "[i]n the division of property rights, there is no rigid formula that must be followed, nor any fixed percentage to which either party is entitled." *Clement v. Clement*, 292 N.W.2d 799, 801 (S.D. 1980) (citation omitted). When a circuit court divides property, "the law does not require perfection that would approach a mathematical certainty." *Pellegrin v. Pellegrin*, 1998 S.D. 19, ¶ 24, 574 N.W.2d 644, 649. In this case, the circuit court did not abuse its discretion by declining to adopt a formula that would account for potential, minor variations in the amount of Tom's tax-lien obligations. Considering the property division as a whole, Tom's monthly obligation to make the tax payment would only affect the overall property division marginally if at all.[6]

---

6.    It does not appear that Tom's monthly payments are likely to ever benefit Annette. The thrust of Tom's argument is that every $500 payment he makes reduces the total amount of the tax lien and consequently increases Annette's equity by $250. However, under the decree, Tom is required to pay Annette $22,187 regardless of whether the sale proceeds are sufficient to cover that amount. Thus, if the net proceeds from the home sale are less

(continued . . .)

Such a decision is not "a choice outside the range of permissible choices[.]" *Gartner,*

_____

(. . . continued)

than $22,187, Annette will not receive any additional value from Tom's $500 payments. Because Tom is then entitled to any remaining proceeds up to $5,000, Tom's payments will not affect the amount Annette receives unless the net proceeds exceed $27,187. However, if the home sells for $27,187, Annette—as a joint owner of the property—is already entitled to 50% of the $22,187 in proceeds allocated to her by the court (i.e., the court functionally ordered Tom to pay Annette only $11,094). Likewise, Tom would also already be entitled to 50% of the $5,000 the court ordered he receive. Thus, at the point at which each of Tom's $500 tax payments would be adding $250 to Annette's equity on a monthly basis, Tom would already have been permitted to retain $8,594 (50% of $22,187 minus 50% of $5,000) in proceeds that would have been distributed to Annette under a true 50/50 division of the property. At that rate, the home would need to be on the market for nearly three years before Tom's tax payments caught up with Annette's deficit.

Further, even if we agreed with Tom's conclusion that the circuit court's decree did not effectively carry out the court's intended property division, Tom ignores the bigger picture of the entire property division. It is clear from the circuit court's decree, findings of fact, and conclusions of law that—aside from the interest and penalties on the tax liability—the court intended to divide the marital estate equally. However, the parties themselves came to an agreement regarding the distribution of personal property and debts other than the tax lien. Under that agreement, Annette received $37,477 in personal property but assumed $21,000 in debt. In contrast, Tom received $54,011 in personal property but assumed only $9,916 in debt. As a result of this $27,618 disparity in value between property received by the parties, the circuit court ordered Tom to pay Annette $10,000 to help balance the personal-property division. This amount, however, still leaves Tom with approximately $7,618 more than Annette. Considering the $8,594 deficit discussed in the preceding paragraph, it appears that Tom's payments would not even begin to tip the financial advantage in Annette's favor—i.e., result in her receiving more cash value than Tom as a result of this property division—until the home had been on the market for over five years.

In order to be entitled to relief on appeal, Tom has the burden of establishing that the circuit court's decision was "outside the range of permissible choices," *Gartner,* 2014 S.D. 74, ¶ 7, 855 N.W.2d at 850, not merely that the court failed in execution to impose an intended debt liability to the penny. As things stand, Tom's tax payments are unlikely to ever benefit Annette under the circuit court's decree. If the total of the sale price and Tom's tax payments ever reach the point where Annette benefits from them, it would take years of such tax payments for the property division to equalize, let alone tip in Annette's favor to such an extent that it becomes inequitable.

2014 S.D. 74, ¶ 7, 855 N.W.2d at 850 (quoting *Arneson*, 2003 S.D. 125, ¶ 14, 670 N.W.2d at 910).

[¶34.]     **7.     *Whether the circuit court abused its discretion in determining the amount and duration of spousal support.***

[¶35.]     Tom asserts the circuit court abused its discretion in ordering Tom to pay Annette $1,000 per month in spousal support for a period of 10 years beginning on the first day of the month following the sale of the home. Tom argues the court abused its discretion in two respects. First, Tom argues that the circuit court clearly erred by concluding Annette's income potential would never approach Tom's. Second, because the 10-year period does not begin until the home sells, Tom argues that the effect of the circuit court's order "was to essentially extend Tom's alimony obligation by a month for every month the home remains unsold." According to Tom, "having the period run from an undetermined point in the future (whenever the home sells) cannot be reasonably justified." We are not persuaded by either argument.

[¶36.]     The circuit court's evaluation of the parties' earning capacities was not clearly erroneous. Tom asserts that "[t]he alimony award is . . . based on the erroneous factual finding that Annette's 'income potential despite her degree will never approach Tom's.'" The reason for this, Tom suggests, is that "[t]here was no evidence suggesting [Annette] could not become qualified to drive equipment at a coal mine, or similarly drive trucks that service the oil fields in North Dakota." However, Tom offers no authority for the proposition that a spouse seeking support must move to another state and seek out a particular occupation or necessarily risk

having its income potential be imputed to that spouse.[7] The circuit court found that Annette earns $10 per hour, seven hours per day, while school is in session. Additionally, at the time of divorce, Annette hoped to continue driving a school bus at least one shift per day at $14.50 per hour. Finally, the court found that Annette has received additional training enabling her to drive charter busses during the summer and for school trips. In comparison, the court also found that Tom has demonstrated an ability to earn in excess of $100,000 per year. Although Tom asserts that he has only earned this amount annually once in his lifetime, that one year occurred immediately prior to the year of divorce and at the same job he currently holds. Consequently, the circuit court found that Tom will likely earn between $96,000 and $120,000 per year, whereas Annette will earn between $20,000 and $24,000 per year. Therefore, we are not "left with a definite and firm conviction" that the circuit court made a mistake in concluding Annette's earning capacity will never approach that of Tom's. *See id.* ¶ 8, 855 N.W.2d at 850 (quoting *Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d at 222).

[¶37.] Even if we agreed that the circuit court clearly erred in its findings on the parties' respective earning capacities, Tom would not necessarily prevail. A circuit court that grants a divorce "may compel one party to make such suitable allowance to the other party for support during the life of that other party or for a

---

7.   If we so held, it is not difficult to imagine myriad future divorce appellants arguing that their support-seeking, former spouses are not entitled to support because they could simply learn to drive a truck, move to Wyoming, and work the coal mines. In a similar vein, such a holding would also invite any support-seeking spouse to claim his or her former spouse is voluntarily underemployed if that spouse earns less than he or she could in the coal mines of Wyoming.

shorter period, as the court may deem just, having regard to the circumstances of the parties represented[.]" SDCL 25-4-41. Relevant circumstances include "the parties' (1) length of marriage; (2) earning capacity; (3) financial condition after the property division; (4) age, health, and physical condition; (5) station in life or social standing; [and] (6) relative fault in the termination of the marriage." *Scherer v. Scherer*, 2015 S.D. 32, ¶ 10, 864 N.W.2d 490, 494. While spousal support "will not be awarded in such an amount as would allow a [spouse] capable of work to sit in idleness, [neither] will it be denied merely because [the spouse] may be able to obtain employment and support [him- or] herself." *Guindon v. Guindon*, 256 N.W.2d 894, 898 (S.D. 1977). Thus, earning capacity is but one factor a court should consider in determining an award of spousal support.

[¶38.] In this case, the circuit court's findings on the relevant factors support its order for spousal support. The parties were married for approximately 14 years. Annette's anticipated annual income is about one-fourth to one-sixth of Tom's. Neither party will derive much financial potential from the property division. Both parties are relatively healthy and in good physical condition, although Tom is approximately eight years older than Annette. The court found that without the ordered support, Annette would be relegated to little more than "a lower rudimentary middle class existence." While the circuit court clearly assigned blame for the parties' dire economic situation to Tom, the divorce itself was granted on the basis of irreconcilable differences. Based on these factors, we cannot conclude the circuit court abused its discretion by ordering Tom to pay spousal support for 10 years following the sale of the home.

[¶39.]     Although Tom argues that "having the [support] period run from an undetermined point in the future (whenever the home sells) cannot be reasonably justified[,]" he offers no authority for the conclusion that such an arrangement is inherently unreasonable.  In this case, such an arrangement only benefited him.  Neither the total amount Tom is required to pay, nor the total amount Annette receives in support, is changed by this arrangement; the only difference is *when* Tom is required to pay certain amounts.  By delaying the start of the 10-year period, the circuit court merely gave Tom the benefit of only having to pay $2,500 per month while the home was on the market rather than $3,500 per month.  In contrast, Annette receives no additional benefit from this arrangement.  Although she is permitted to live in the home prior to sale, she is deprived of the flexibility that accompanies a cash payment of spousal support during that time.  Tom can hardly complain about such an arrangement.  The circuit court has discretion to "compel one party to make such suitable allowance to the other party for support during the life of that other party *or for a shorter period*[.]"  SDCL 25-4-41 (emphasis added).  The circuit court did not abuse its discretion by ordering Tom to pay spousal support for a period of 10 years following the sale of the parties' home.

[¶40.]     **8.     *Whether Annette should be awarded appellate attorney fees.***

[¶41.]     Annette requested reimbursement of appellate attorney fees.  SDCL 15-26A-87.3 permits us to grant appellate attorney fees "where such fees are permissible at the trial level."  *Grynberg Expl. Corp. v. Puckett*, 2004 S.D. 77, ¶ 33, 682 N.W.2d 317, 324 (quoting *Hentz v. City of Spearfish, Dep't of Pub. Works, Office of Planning & Zoning*, 2002 S.D. 74, ¶ 13, 648 N.W.2d 338, 342).  Therefore, "if

appropriate, in the interests of justice, [this Court] may award payment of [appellate] attorneys' fees in all cases of divorce, annulment of marriage, determination of paternity, custody, visitation, separate maintenance, support, or alimony." SDCL 15-17-38. Here, not only does Tom receive more in the division of *marital* property and debts, his income is substantially greater than Annette's. As noted above, the circuit court found that Tom's expected income is between $96,000 and $120,000 per year, whereas Annette's is only between $20,000 and $24,000 per year. Therefore, we conclude that Tom should pay Annette's appellate attorney fees in the amount of $7,587.49.

**Conclusion**

[¶42.]     We decline Tom's invitation to alter the standards of review applicable to this case. Whether the circuit court erred by not specifically stating that Tom's support obligation to Annette terminates in the event of Tom's death is not ripe for review. The circuit court was not required to assign 50% of the mortgage, insurance, and property-tax payments to Annette, and we overrule *Foley* on this issue. The court did not abuse its discretion in deciding that the interest-and-penalties portion of the IRS tax lien is Tom's nonmarital debt. Because Tom's tax payments are unlikely to ever benefit Annette, the circuit court did not abuse its discretion by declining to give Tom a credit for half of each tax payment. The circuit court did not abuse its discretion in ordering Tom to pay $1,000 in spousal support to Annette each month for 10 years following the sale of the home. Finally, Tom must pay Annette's appellate attorney fees. We affirm.

[¶43.]     ZINTER, SEVERSON, WILBUR, and KERN, Justices, concur.