#30884-a-MES
**2025 S.D. 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SONJA R. KING,                                   Plaintiff and Appellee,

    v.

GARY A. KING,                                   Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

\* \* \* \*

MITCHELL A. PETERSON
THOMAS M. FRANKMAN of
Davenport, Evans, Hurwitz &
   Smith, LLP
Sioux Falls, South Dakota                       Attorneys for defendant and
                                                appellant.


RACHEL PREHEIM of
Lockwood & Zahrbock Kool Law Office
Sioux Falls, South Dakota                       Attorneys for plaintiff and
                                                appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
AUGUST 26, 2025
OPINION FILED **11/19/25**

#30884

SALTER, Justice

[¶1.] In this divorce action, the husband appeals the circuit court's decision to treat his pending lawsuit against his former business partners as a marital asset subject to valuation and equitable division. We affirm.

**Factual and Procedural Background**

[¶2.] Sonja and Gary King were married in 2004 and have two minor children together. At the time of their marriage, the couple lived in Omaha where Sonja worked full time as a mortgage banker for Wells Fargo while Gary completed his master's degree in business administration at Creighton University. After graduating, Gary accepted a position as a senior underwriter at Mutual of Omaha. Around that same time, Sonja left Wells Fargo to start her own private mortgage company and began working independently as a mortgage broker.

[¶3.] Following the birth of their second child, Gary launched his own insurance agency, Cypress Risk Management, LLC (Cypress), which sold insurance policies to colleges and universities for their student-athletes. The couple moved to Sioux Falls in 2013. Gary's work required significant travel, and Sonja began scaling back the number of hours she worked, eventually leaving the mortgage industry entirely to remain at home to care for the couple's two children.

[¶4.] Gary focused on growing Cypress, which appeared to perform well. Around 2020, Gary and a group of local investors began several other business ventures, most of which were unrelated to Cypress. Gary was named president and managing member of Rushmore Gaming, LLC, which, along with a number of ancillary limited liability companies, was part of a larger enterprise operated by the

investment group.  Gary undertook these additional roles while continuing to run Cypress.

[¶5.]        Beginning in early 2023, Gary and Cypress came under scrutiny from customers and state insurance regulators.  In January, an insurance carrier commenced a civil action, alleging Gary failed to remit insurance premiums entrusted to him.  Gary did not respond, resulting in a default judgment against him for $708,076.  Nor did Gary respond to related inquiries from the South Dakota Division of Insurance, which ultimately led to the revocation of his insurance license and Cypress's business entity license.  The investment group swiftly severed ties with Gary, and soon after, the South Dakota Gaming Commission revoked his gaming license.[1]

[¶6.]        At home, Sonja was unaware of Gary's legal and business difficulties, at least initially.  She learned the truth and discovered a broader pattern of Gary's self-destructive behavior after one of their sons inadvertently discovered photographs on Gary's iPad depicting a woman with whom Gary was having an extramarital affair.  Sonja commenced this divorce action in May 2023, alleging extreme cruelty and adultery or, in the alternative, irreconcilable differences.  Sonja sought, among other things, an equitable division of marital property and debts of the parties.

---

1.      On February 29, 2024, Gary was indicted by a District of South Dakota grand jury on sixteen criminal counts, including nine counts of wire fraud, four counts of money laundering, two counts of bank fraud, and one count of mail fraud.

[¶7.]    Following the commencement of the divorce action, Gary retained counsel to explore legal options against his former business partners to recover money he loaned or advanced to the businesses. Gary paid his law firm a $50,000 retainer using marital funds, and on August 7, 2023, his attorney sent a demand letter to several attorneys who were apparently representing four individuals identified as Gary's former business partners.

[¶8.]    The demand letter listed $1,059,000 allegedly owed to Gary under certain promissory notes and another $1,646,129 for other loans and money advanced by Gary on behalf of their business entities. All told, the demand letter sought payment of $3,016,001. Attached to the letter were six pages of charts detailing the individual loans and amounts advanced. After the demand proved unsuccessful, Gary—on behalf of himself and three companies, including Cypress—commenced an action against the individual business partners as well as four associated limited liability companies.

[¶9.]    Meanwhile, the circuit court conducted a three-day court trial in the couple's divorce case. At the outset, the court asked the parties about the extent of the disputed issues. Sonja's lawyer noted that "[regarding] the assets and liabilities, essentially everything is in dispute with the exception of" a vacation home not relevant to this appeal. Counsel for Gary viewed the issues differently and described the terms of what he claimed to be a verbal agreement relating to the pending civil action:

> [T]hey agreed that Gary would retain all interest in any and all lawsuits pending and be responsible for satisfying any and all judgments with the exception that should Gary receive money from one of the pending lawsuits, Sonja will receive the first

$25,000, which is one-half of the money spent for the attorney fee retainer from marital assets to commence the lawsuit.

[¶10.] The parties submitted a joint property exhibit which listed the "$50k that Sonja gave to Gary for retainer for his lawsuit" as an asset, though, as the circuit court later noted, the money was already "gone." The joint property exhibit did not specifically include Gary's civil action against his former partners, but it did list Gary's interest in each of the limited liability companies that were involved in the suit, though neither party assigned a value, and the court made a notation next to the defendant entities that read "lawsuit."

[¶11.] During her case-in-chief, Sonja testified that she was aware of Gary's other business ventures but admitted she "couldn't keep up with all of them." As late as March 2023, Sonja recalled Gary telling her that their net worth "was over four and a half million dollars." Despite their personal bank accounts not reflecting that amount, she trusted Gary because it was her understanding that "all of [their] marital assets were . . . being invested into [Gary's] businesses to grow . . . for long-term financial security and stability." She also recalled Gary "telling [her] how his business partners weren't contributing," so "[h]e was carrying the weight of everybody." But she trusted Gary's assurances "that we were going to get repaid . . . for all this money that he was putting in."

[¶12.] After filing for divorce and finding out that Gary was no longer involved with the businesses, Sonja "learned . . . that the majority of the money we had . . . he claims he had invested with businesses and that he was in the process of filing lawsuits with his business partners to recoup the money that he put into those businesses." Sonja testified that Gary subsequently "provided [her] all sorts

of documentation on loans that he had put into these LLC's" as a way of showing her that "he put all of [their] finances . . . into these businesses."

[¶13.] During Gary's testimony, he described each of the business entities listed on the joint property exhibit and stated that some of them were still in business though he was no longer involved. On redirect examination, he provided testimony on the alleged agreement regarding the lawsuit that his counsel referenced at the beginning of trial.

> Q: Were you under the impression that there was an agreement between you and Sonja and the two lawyers here that you were going to retain all interests in . . . this lawsuit involving your business, and you were going to pay Sonja . . . $25,000 as half of the amount for the retainer?
>
> A: That was what was requested and, yes, that's what we agreed to.
>
> Q: And as far as the value of the lawsuit, you could get zero?
>
> A: I'm well aware of that, and . . . I'm not certain a couple of partners could recover.
>
> Q: They could file bankruptcy?
>
> A: Yes.
>
> Q: And you're going to be spending hundreds of thousands of dollars trying to figure that out, aren't you?
>
> A: That in addition to possibly years of litigation.

[¶14.] In his closing argument, Gary's counsel reiterated his belief that the parties agreed Sonja was entitled to $25,000 "before we ever got to court." He further asserted he "put it in [their] proposed stipulation at the beginning of this trial, and we agreed . . . that after that, Gary's on his own with whether he can ever collect anything from that lawsuit." In response, Sonja's counsel again denied the

existence of any agreement regarding the lawsuit and clarified that the alleged agreement was simply a part of the "settlement negotiations before trial." So, in Sonja's view, "those decisions [were] up to the court to make."

[¶15.] The circuit court issued an oral ruling granting Sonja a divorce on the grounds of extreme cruelty and adultery. Regarding the property division, the court found the pending civil lawsuit to be marital property, valued it at $350,000, and assigned it to Gary. In reaching this amount, the court first determined that it had to be worth at least $50,000 because Gary had already invested $50,000 in marital funds for a retainer to initiate the litigation. Next, the court added $300,000 because it represented "roughly 10% of what [Gary] is claiming he's owed." The court also rejected Gary's claims of an agreement to split the retainer, finding that any such agreement "necessarily [was a] pretrial negotiation strateg[y]."

[¶16.] In its later written findings concerning the valuation of the lawsuit, the circuit court further explained:

> Gary is reckless but also intelligent and shrewd, and represented by competent counsel. The retainer is essentially an investment in a potential outcome and the demand is the best-case scenario for the outcome in the business lawsuit. Based upon all of the evidence in the case a valuation of Gary's cause of action against his former business partners of the actual money he has invested plus only 10% of his legal demand is a very conservative and rational valuation for the [c]ourt to make.

[¶17.] Gary appeals, raising two issues, which we restate as follows:

1. Whether the circuit court abused its discretion when it classified the lawsuit as marital property.

2. Whether the circuit court clearly erred in its valuation of the lawsuit.

## Analysis

### *Classifying the lawsuit as marital property and the alleged stipulation*

[¶18.] We review a circuit court's decision to determine whether property is marital or non-marital for an abuse of discretion. *Anderson v. Anderson*, 2015 S.D. 28, ¶ 8, 864 N.W.2d 10, 14. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d 617, 622 (quoting *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850).

[¶19.] "We have described South Dakota, in general terms, as an 'all property state,' which means that 'all property of both of the divorcing parties [is] subject to equitable division by the [circuit] court, regardless of title or origin.'" *Field v. Field*, 2020 S.D. 51, ¶ 16, 949 N.W.2d 221, 224 (alterations in original) (quoting *Billion v. Billion*, 1996 S.D. 101, ¶ 61, 553 N.W.2d 226, 237). This is an extension, or "an uncomplicated interpretation," of SDCL 25-4-44, which states:

> When a divorce is granted, the courts may make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or the wife. In making such division of the property, the court shall have regard for equity and the circumstances of the parties.

*Field*, 2020 S.D. 51, ¶ 16, 949 N.W.2d at 224 (quoting SDCL 25-4-44).

[¶20.] We consider a number of factors in determining whether to exclude property from the marital estate, and thus not subject to equitable division. *Id.* ¶ 18, 949 N.W.2d at 225. "However, the principal rule for analyzing a discrete claim of separate property provides that '[o]nly where one spouse has made no or de

minimis contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as "non-marital" property.'" *Id.* (quoting *Novak v. Novak*, 2006 S.D. 34, ¶ 5, 713 N.W.2d 551, 552–53).

[¶21.] But, here, Gary does not seek to apply these rules; the only justification for his argument that his lawsuit should be considered separate property is a purported stipulation between the parties. This claim, however, is unsustainable for two reasons.

[¶22.] First, the record does not support the existence of such a stipulation.[2] Insofar as we can determine, the issue may have been discussed as part of settlement negotiations, but there is no evidence these negotiations came to fruition. Instead, Gary relies mainly on what he claims to be Sonja's failure to object to his references to the alleged agreement at trial. But the record does not support the assertion that Sonja remained silent or otherwise acceded to Gary's assertion.

[¶23.] To the contrary, in her first response to the circuit court, Sonja stated that "essentially everything [was] in dispute" on the joint property exhibit. She then clarified multiple times that Gary's purported agreement represented nothing more than settlement negotiations. Gary asserts that, as a result of her "inaction," Sonja "failed to meet her burden in establishing the [lawsuit] as a marital asset," but it was Gary who bore the burden to show the lawsuit was nonmarital. *See*

---

2. The circuit court did not expressly rule on the existence of an agreement to designate Gary's lawsuit as nonmarital property, but the court implicitly rejected the argument by treating the lawsuit as marital property subject to equitable division.

*Johnson v. Johnson*, 2007 S.D. 56, ¶ 34, 734 N.W.2d 801, 810 ("[T]he burden of proof to show the property is nonmarital remains with the person making the claim." (quoting *Parde v. Parde*, 602 N.W.2d 657, 662 (Neb. 1999))).

[¶24.] Second, Gary's stipulation argument falls short for the additional reason that the purported agreement, as described at trial, seems to address only the allocation of the lawsuit as an asset to Gary, not its characterization as marital or separate property—i.e., "Gary would *retain all interest* in any and all lawsuits pending . . . ." (Emphasis added.) That is, in fact, exactly what happened; the circuit court awarded the lawsuit to Gary as an unliquidated asset which the court discounted for the contingencies of litigation, as noted above.[3]

### *The unliquidated lawsuit as marital property*

[¶25.] Gary makes a separate argument to support his claim that the lawsuit should be considered non-marital property by suggesting that an individual spouse's pending lawsuit can never be treated as marital property because valuation would be inherently speculative. However, Gary did not raise this argument to the circuit court either at trial or in his objection to Sonja's proposed findings of fact addressing the court's valuation of the lawsuit. As a result, we question whether the issue is

---

3. Gary also argues that the circuit court improperly acted sua sponte to treat the lawsuit as part of the marital estate because it was not separately listed on the parties' joint property exhibit. We cannot accept this claim. Though the lawsuit was not specifically listed, the companies that are at the center of it were listed, though neither party placed a value on them. The parties also discussed the lawsuit in their testimony, and the record contains the demand letter and complaint. In the end, the court's statutory authority to "make an equitable division of the property belonging to either or both" spouses is not conditioned upon the property being listed in a joint property exhibit. SDCL 25-4-44.

properly before us, though Sonja has not argued that the argument was waived. *See Dunham v. Sabers*, 2022 S.D. 65, ¶ 67 n.9, 981 N.W.2d 620, 643 n.9 ("We have stated that '[a] party may not raise an issue for the first time on appeal . . . .'" (first alteration in original) (quoting *Ellingson v. Ammann*, 2013 S.D. 32, ¶ 10, 830 N.W.2d 99, 102)).

[¶26.] But, preserved or not, there is no justification for the categorical rule Gary suggests. Though individual results in decisions have sometimes held that certain unliquidated claims cannot be valued, there is no broad rule that categorically prohibits courts from considering pending legal claims as marital property in *all* cases. *See Hanify v. Hanify*, 526 N.E.2d 1056, 1059 (Mass. 1988) ("The fact that the pending lawsuits are of uncertain value does not require their exclusion from the marital estate.").[4]

[¶27.] "An unliquidated claim for money damages constitutes a chose in action." *Id.* (collecting cases and acknowledging that "many jurisdictions hold that pending lawsuits constitute marital property subject to division on divorce"). And we have previously described "a chose in action [a]s a form of personal property." *Fritzel v. Roy Johnson Constr.*, 1999 S.D. 59, ¶ 1, 594 N.W.2d 336, 337. From this, it follows logically that such a claim can be considered personal property that can be included in a marital estate and subject to equitable division by the circuit court. Indeed, we have implicitly treated pending or potential legal claims as marital assets that are subject to equitable division in at least two decisions. *See Krage v.*

---

4.  The court in *Hanify* affirmed the division of a pending lawsuit "on an 'if and when received' basis." 526 N.E.2d at 1059–61. But neither party here has advocated for this type of a division.

*Krage*, 329 N.W.2d 878, 880 n.1 (S.D. 1983) (noting the circuit court "considered a chose in action for destruction of property by fire" and "awarded any proceeds therefrom" commensurate with the ratio used for the division of property); *Kappenmann v. Kappenmann*, 479 N.W.2d 520, 524–25 (S.D. 1992) (affirming circuit court's decision to include wife's pending claim in the marital estate and assign value based on a rejected settlement offer).

[¶28.] In the parties' efforts to develop their arguments, they each focus on decisions addressing the separate or marital nature of personal injury awards. *See, e.g., Johnson*, 2007 S.D. 56, ¶¶ 32–34, 734 N.W.2d at 809–10 (holding that only the "portions of a personal injury award that . . . diminish the marital estate are" considered marital property). But Gary's lawsuit is unlike a personal injury award that involves separate and discrete types of damages—some economic and some noneconomic.

[¶29.] Instead, Gary's action involves more straightforward economic damage claims seeking reimbursement for money he claims to have personally advanced to his businesses for travel and operations. The money Gary loaned came from marital funds, and any recovery would constitute a restoration of those funds. Without question, the lawsuit is marital property that we would expect to be subject to equitable division.

[¶30.] The circuit court did not abuse its discretion in its classification of the lawsuit as marital property under the theory that it cannot be valued. *See id.* ¶ 31, 734 N.W.2d at 809 (acknowledging "our deferential standard of review obviously came into play" after discussing cases involving personal injury awards in the

context of divorce proceedings). The separate issue of the circuit court's actual valuation, however, remains.

**Valuation of the lawsuit**

[¶31.] Acting pursuant to their statutory authority under SDCL 25-4-44 to make an equitable division of the marital estate, circuit courts are often required to determine the value of the parties' marital assets. As triers of fact, circuit courts are uniquely positioned to determine value, and we review their valuation decisions for clear error. *Dunham*, 2022 S.D. 65, ¶ 63, 981 N.W.2d at 642. Under this deferential standard, we will reverse the circuit court's valuation "only when a complete review of the evidence leaves [this] Court with a definite and firm conviction that a mistake has been made." *Id.* (alteration in original) (quoting *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 15, 826 N.W.2d 627, 633).

[¶32.] Our rules for valuation allow circuit courts considerable flexibility in reaching their decision. "The circuit court's valuation of assets does not have to be exact." *Id.* In addition, "a circuit court is not required to accept either party's proposed valuation of an asset." *Conti v. Conti*, 2021 S.D. 62, ¶ 26, 967 N.W.2d 10, 16–17 (citation omitted). They must, instead, simply "fall 'within a reasonable range of figures,' based on the evidence presented at trial." *Id.* at 17 (quoting *Hill v. Hill*, 2009 S.D. 18, ¶ 14, 763 N.W.2d 818, 823).

[¶33.] Here, Gary asserts that even if pending lawsuits are not categorically barred from being included in the marital estate, the circuit court's valuation of his lawsuit was clearly erroneous because there was "no definitive evidence in the record that could have appropriately established a present value on the lawsuit."

And as a corollary to his earlier stipulation argument, Gary contends that Sonja did not present evidence to dispute his testimony that she was only entitled to one-half of the $50,000 retainer and that "he would retain all interest in the lawsuit." In Gary's view, the court's valuation is a product of "speculative and conjectural figures." We disagree.

[¶34.] Sonja introduced the demand letter that Gary had sent to his former partners seeking reimbursements of more than $3,000,000 in loans and monies he claimed to have contributed to the businesses. Sonja included charts documenting the amounts Gary claimed he was owed. The demand letter, as well as the complaint Sonja also introduced, detailed Gary's various legal theories of recovery for additional damages, including punitive damages that Gary sought from his former partners. Although Gary testified to concerns about collecting on a judgment, he did not minimize the amounts he claimed his former business partners owed him, nor did he present any documentary evidence to support his claim that a judgment could be difficult to collect.

[¶35.] The circuit court correctly recognized that the $50,000 in marital funds used for a retainer, though listed on the joint property exhibit, was not, itself, an asset; it had already been used to retain counsel for the lawsuit. Instead, the court found that Gary "invested $50,000 for a retainer to initiate the litigation," which suggested that Gary believed "it's got to at least be worth the $50,000." The court was also keenly aware of the uncertainty associated with the lawsuit and the risk that Gary would not recover anything, describing the initial demand as "the best-case scenario for the outcome in the business lawsuit." Indeed, it was for this exact

reason that the court deeply discounted the demand to account for the contingencies of litigation.

[¶36.] And though Gary may be critical of the discount formula the circuit court applied, it strikes us as incongruent that Gary would suggest that the amount requested in his thoughtfully drafted, detailed demand letter was speculative. Both parties testified that the marital funds were being invested back into Gary's businesses. And attached to the demand letter was *Gary's own* detailed accounting of the loans and advances to his businesses. These amounts were consistent with Sonja's understanding of their net worth prior to Gary's legal issues and her understanding that "the majority of the money [they] had" was invested "to get these businesses up and running."[5]

[¶37.] As to the discount itself, the circuit court found the discounted $350,000 valuation of the lawsuit included the $50,000 retainer plus "roughly 10% of what Mr. King is claiming he's owed." The court described its initial efforts to account for the risks before explaining the $350,000 valuation was "the most conservative calculation" it was "logically comfortable with for that business."

[¶38.] Gary nevertheless maintains that none of the above supported a present value for the lawsuit and referred to the circuit court's use of 10% of the

---

5. Gary finds fault with the fact that the circuit court's valuation analysis noted the identity and "excellent reputation" of his law firm and that it does not "typically take junk litigation." The same firm represents Gary in this appeal, and leaving any irony aside, we think the court's written findings of fact make clear that it was simply noting that Gary had successfully engaged "competent counsel" to handle the lawsuit, which seems like a legitimate consideration. Had Gary not been able to find an attorney to represent him, that may well have suggested the suit lacked factual or legal support or that the odds of recovery were too long.

demand as "an arbitrary figure." This, however, misunderstands three immutable facts: (1) valuing any unliquidated legal claim will necessarily involve some degree of uncertainty, but the rules guiding the broad discretion circuit courts exercise in their valuation efforts do not require mathematical certainty; (2) absent exceptional circumstances not present here, a circuit court's valuation of marital assets should be made at the time of the divorce; and (3) our review is perceptibly deferential and with good reason because we are detached from the task of weighing evidence and undertaking an equitable distribution of the marital estate. *See Johnson*, 2007 S.D. 56, ¶ 37, 734 N.W.2d at 810–11 ("'We do not require exactitude in the trial court's valuation of assets' . . . but the value must be within the range of evidence presented to the court." (internal citation omitted) (quoting *DeVries v. DeVries*, 519 N.W.2d 73, 75 (S.D. 1994))).

[¶39.] From our review, it appears the circuit court's valuation "fall[s] 'within a reasonable range of figures,' based on the evidence presented at trial." *Conti*, 2021 S.D. 62, ¶ 26, 967 N.W.2d at 17 (quoting *Hill*, 2009 S.D. 18, ¶ 14, 763 N.W.2d at 823). This evidence was sufficient to inform the circuit court about the nature of the lawsuit and allow it to assess its value.

### Conclusion

[¶40.] The circuit court did not abuse its discretion when it treated the lawsuit as marital property. Contrary to Gary's assertions on appeal, the record does not contain a stipulation from the parties agreeing to classify the lawsuit as separate property. But the record does show that Gary used martial funds to initiate the lawsuit, and the lawsuit seeks to recover marital funds that Gary had

loaned to his business ventures. Moreover, the circuit court's valuation of the pending lawsuit was not clearly erroneous. The court relied upon the evidence presented at trial to arrive at a value of the lawsuit that fell "within a reasonable range of figures." *Id.* We therefore affirm the circuit court's classification and valuation of the pending lawsuit within its property distribution.

[¶41.] Finally, Sonja has filed a motion pursuant to SDCL 15-26A-87.3 seeking appellate attorney fees. We grant the motion and award attorney fees in the requested amount of $7,812.50.

[¶42.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.